ORIGINAL

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

FEB 1 3 2008

CLERK, U.S. DISTRICT COURT
Deputy

| | | |
|---|---|---|
| LONE STAR FUND V (U.S.), L.P. and LSF5 BOND HOLDINGS, LLC, | §<br>§<br>§ | |
| **Plaintiffs,** | § | CIVIL ACTION NO. |
| | § | |
| v. | § | |
| | § | **308 CV - 261 - L** |
| BARCLAYS BANK PLC and BARCLAYS CAPITAL INC., | §<br>§ | |
| **Defendants.** | §<br>§ | 19233 |

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1334(b), 1446 and 1452(a), and, alternatively, pursuant to 28 U.S.C. §§ 1332, 1446 and 1441(a), defendants Barclays Bank PLC and Barclays Capital Inc. (collectively "Defendants") hereby remove the above-captioned civil action, and all claims and causes of action therein, from the District Court of Dallas County, Texas, to the United States District Court for the Northern District of Texas, Dallas Division. Defendants appear for the purposes of removal only and for no other purpose, reserve all defenses and rights available to them, and state as follows:

1.      Plaintiffs filed the above-captioned action on January 14, 2008 against Defendants in the District Court of Dallas County, Texas under Cause No. 08-00398. No Defendant was served prior to January 14, 2008. A true and correct copy of the citation and original petition, which is the only pleading thus far served upon Defendants, is attached hereto as Exhibit A. A true and correct copy of the docket sheet for this action from the District Court of Dallas County, Texas is attached hereto as Exhibit B.

2.      Plaintiffs have agreed to extend the time for all Defendants to respond to the petition until February 14, 2008. A true and correct copy of the written agreement is attached hereto as Exhibit C.

3.      This notice is being filed within 30 days of service on Defendants and thus is timely filed under 28 U.S.C. § 1446(b).

4.      In their petition, Plaintiffs allege that (i) Plaintiff LSF5 Bond Holdings, LLC purchased from Defendant Barclays Capital Inc. certain mortgage pass-through certificates (the "Certificates") pursuant to two securities offerings in May and June of 2007; (ii) that the mortgage loans underlying the Certificates (the "Mortgage Loans") had been purchased by Defendant Barclays Bank PLC, through its affiliate, from certain residential mortgage loan originators; (iii) that the Prospectus Supplements for the Certificates and certain related agreements contained materially false representations regarding certain of the Mortgage Loans; and (iv) that Defendants knew or should have known that the representations were false at the time they were made. Plaintiffs seek to recover damages from Defendants pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act"), Article 581 of the Texas Securities Act, Section 27.01 of the Texas Business and Commerce Code, and under theories of common law fraud and negligent misrepresentation.

5.      The alleged misrepresentations in the Prospectus Supplements and in other documents relate to certain Mortgage Loans purchased by Defendant Barclays Bank PLC, through its affiliate Sutton Funding LLC ("Sutton"), from NC Capital Corporation ("NC Capital"), a subsidiary of New Century Financial Corporation ("New Century"). These purchases were effected pursuant to an Amended and Restated Mortgage Loan Purchase Agreement dated June 1, 2006 (the "MLPA"), attached hereto as Exhibit D, several bid letters

2

(the "Bid Letters") from Defendant Barclays Bank PLC to NC Capital,[1] and the related Purchase

Price and Terms Agreements,[2] which contain (expressly or by reference) certain indemnification

provisions for the benefit of Defendants.

> 6.    Specifically, the Bid Letters provide that:

> The Seller will also agree that it will, in the event the Purchaser securitizes the Mortgage Loans . . . jointly and severally with any affiliate thereof acceptable to the Purchaser agree (A) to indemnify and hold harmless the Purchaser, each affiliate designated by the Purchaser and each person who controls the Purchaser or such affiliate from and against any and all losses, claims, damages and liabilities arising from any untrue statement or alleged untrue statement of a material fact contained in any information with respect to the Seller, its affiliate, its business or the Mortgage Loans . . . in the related offering documents, including collateral term sheets and computational materials, or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading . . . .

> 7.    The MLPA confirms and furthers the Bid Letters' indemnity provision by

providing that NC Capital will indemnify, among others, Sutton, Sutton's affiliates, and entities

controlling Sutton or its affiliates for:

> any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that each of them may sustain arising out of or based upon any untrue statement or alleged untrue statement of a material fact contained in the information provided by or on behalf of the Seller or the Originator regarding the Seller, the Originator, the Seller's and Originator's servicing practices or performance, the Mortgage Loans or the Underwriting Guidelines set forth in any offering document prepared in connection with any Reconstitution.

MLPA § 13.01. That section also provides a "bringdown" for securitizations, of the mortgage

loans at issue, such that NC Capital agrees to "restate the representations and warranties set forth

---

[1] A copy of one of the applicable Bid Letters is attached hereto as <u>Exhibit E</u>.  The relevant indemnification language quoted in this Notice of Removal appears in each of the several Bid Letters.

[2] A copy of one of the applicable Purchase Price and Terms Agreements is attached hereto as <u>Exhibit F</u>.

in this Agreement" as of the closing date for each such securitization. *See id.* Defendant

Barclays Bank PLC is a beneficiary of this indemnity as it is an entity controlling Sutton within

the meaning of the MLPA, and Defendant Barclays Capital Inc. is a beneficiary of this indemnity

because it is an affiliate of Sutton within the meaning of the MLPA.

        8.      Further, the MPLA provides for additional indemnification by the seller,

including for third party claims:

> The Seller shall indemnify the Purchaser and its present and former
> directors, officers, employees and agents . . . and hold such parties
> harmless against any and all claims, losses, damages, penalties, fines,
> forfeitures, legal fees and expenses (including legal fees and expenses
> incurred in connection with the enforcement of the Seller's
> indemnification obligation under this Section 14.01) and related costs,
> judgments, and any other costs, fees and expenses that such parties may
> sustain in any way related to (i) the failure of the Seller to perform its
> duties and the Originator to service the Mortgage Loans in strict
> compliance with the terms of this Agreement or any Reconstitution
> Agreement entered into pursuant to Article XIII, (ii) any breach of any of
> Seller's representation, warranties and covenants set forth in this
> Agreement . . . .

MPLA § 14.01. Barclays Bank PLC is a beneficiary of this indemnity because it acted as

Purchaser under the MLPA when it signed the applicable Bid Letters and Purchase and Price

Terms Agreements.

        9.      Finally, the several Purchase Price and Terms Agreements executed in

connection with each purchase of the Mortgage Loans incorporate the terms, including the

indemnification provision, set forth in the Bid Letters, and are subject to the provisions of the

MLPA.

        10.     On April 2, 2007, New Century and certain of its subsidiaries, including

NC Capital, filed voluntary petitions for reorganization under Chapter 11 of the United States

Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, Case No.

07-10416.  New Century and NC Capital's bankruptcy proceedings are currently pending before

the Honorable Kevin J. Carey, United States Bankruptcy Judge.

        11.     This Court has original jurisdiction over this matter under 28 U.S.C.

§ 1334(b), and this action may be removed to this Court by Defendants pursuant to 28 U.S.C.

§ 1452(a), because this lawsuit is "related to" a case under Chapter 11, namely NC Capital's

pending bankruptcy proceeding.  This lawsuit relates to NC Capital's bankruptcy because,

pursuant to the Amended and Restated Mortgage Loan Purchase Agreement, Defendants have

certain rights to indemnification from NC Capital in the event a judgment is entered against them

in this action and as a result of any costs and expenses incurred by Defendants to defend against

this action.  Consequently, the outcome of this case will have a direct effect on the bankruptcy

estate.

        12.     Alternatively, this action may be removed to this Court under the

supremacy clause (U.S. Constitution Article VI, Clause 2), because of the denial of a substantive

federal right available in a federal court that is not available in Texas state court.  The Private

Securities Litigation Reform Act of 1995 (the "PSLRA") amended the 1933 Act such that in

actions under the 1993 Act, "all discovery and other proceedings shall be stayed during the

pendency of any motion to dismiss . . . ."  15 U.S.C. § 77z-1(b).  Defendants intend to move to

dismiss this action in federal court, because (*inter alia*) the petition fails to state a claim under

Rule 12(b)(6) of the Federal Rules of Civil Procedure.  However, no such pre-discovery

procedural avenue is available in Texas state court.  Thus, removal is necessary to prevent denial

of a substantive federal right – to stay discovery in actions arising under the 1933 Act pending a

motion to dismiss.  Removal is further justified under the supremacy clause, as this clear federal

law mandating a stay of discovery trumps any Texas state procedures (such as the lack of availability of a motion to dismiss) that are inconsistent with the federal law.

13.     Alternatively, this action may be removed to this Court pursuant to 28 U.S.C. § 1441(a).  This Court has original jurisdiction over this matter under 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and, upon information and belief, the action is between citizens of different states. Defendant Barclays Bank PLC is a public limited company registered in England and Wales, with its registered head office in London, England.  See Plaintiffs' Original Petition ("Pet.") ¶ 9. Defendant Barclays Capital Inc. is a corporation organized and existing under the law of the State of Connecticut, with its principal place of business in New York, New York.  See Pet. ¶ 10. Plaintiff Lone Star Fund V (U.S.), L.P. is not a "real party in interest" to this action and, for purposes of determining whether this Court has original jurisdiction over this matter, its citizenship should therefore be ignored.  Plaintiff LSF5 Bond Holdings, LLC has not alleged its state of citizenship.

14.     Defendants will promptly serve a copy of this Notice on counsel for Plaintiffs and will file a copy of this Notice with the Clerk of the District Court of Dallas County, Texas, pursuant to 28 U.S.C. § 1446(d).

15.     Pursuant to Local Rule 81.1, an original and one copy of the following documents are being provided to the District Clerk for filing:  (1) this Notice of Removal; (2) a Civil Cover Sheet; and (3) a Supplemental Civil Cover Sheet.  Attached to this Notice as Exhibit G are the following:  (1) a copy of the state court docket sheet; (2) an index of all documents filed in the state court; and (3) each document filed in the state court action.  Attached to this Notice as Exhibit H is a Certificate of Interested Persons.

6

WHEREFORE, Defendants, under 28 U.S.C. § 1452(a), and, alternatively, under

U.S. Constitution Article VI, Clause 2 and 15 U.S.C. § 77z-1(b), and alternatively, under 28

U.S.C. § 1441(a), remove this action in its entirety from the District Court of Dallas County,

Texas, to this Court.

<div style="margin-left:40%">

Respectfully submitted,

JACKSON WALKER L.L.P.

By: _____
   Mark T. Josephs
   State Bar No. 11031400
   mjosephs@jw.com

   W. Ross Forbes, Jr.
   State Bar No. 00796564
   rforbes@jw.com

   901 Main Street, Suite 6000
   Dallas, Texas  75202
   (214) 953-6000
   (214) 953-5822 – Fax

ATTORNEYS FOR DEFENDANTS
BARCLAYS BANK PLC and
BARCLAYS CAPITAL INC.

</div>

Of Counsel:

Evan A. Davis
Mitchell A. Lowenthal
Jason P. Gottlieb
Claire De Saint Vincent
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

## CERTIFICATE OF SERVICE

This is to certify that on this 13 day of February, 2008,  a true and correct copy of the foregoing document was served via facsimile and certified mail, return receipt requested:

Karen L. Hirschman
Matthew W. Moran
VINSON & ELKINS L.L.P.
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201

Kenneth P. Held
VINSON & ELKINS L.L.P.
First City Tower
1001 Fannin Street, Suite 2500
Houston, Texas 77002

W. Ross Forbes, Jr.

5025586v.1 001918/00035





CAUSE NO. 08 00398

| | |
|---|---|
| LONE STAR FUND V (U.S.), L.P. and<br>LSF5 BOND HOLDINGS, LLC,<br><br>      Plaintiff,<br><br>VS.<br><br>BARCLAYS BANK PLC and<br>BARCLAYS CAPITAL INC.,<br><br>      Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

CO JUN 14  FH 3:08

IN THE DISTRICT COURT OF

DALLAS COUNTY, TEXAS

D-95th

_____ JUDICIAL DISTRICT

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE COURT:

COME NOW PLAINTIFFS LONE STAR FUND V (U.S.), L.P. ("Lone Star Fund") and

LSF5 BOND HOLDINGS, LLC ("LSF5") (individually or collectively "Lone Star" or

"Plaintiffs") and file this Original Petition against Defendants Barclays Bank PLC ("Barclays

PLC") and Barclays Capital Inc. ("Barclays Capital") (collectively, "Defendants" or "Barclays").

### I.     DISCOVERY CONTROL PLAN

This case will proceed under Discovery Control Plan Level II pursuant to Rule 190.3 of

the Texas Rules of Civil Procedure.  Plaintiffs reserve the right to move for the entry of a

discovery control plan pursuant to Rule 190.4 of the Texas Rules of Civil Procedure.

### II.     NATURE OF THE ACTION

1.     This is a case about a $60 million fraud orchestrated and perpetrated by Barclays,

a global financial institution and investment banking firm.  In mid-2007, Barclays created and

sold securities in a structured finance product called mortgage pass-through certificates

("MPTCs" or "Certificates").  The MPTCs are securities that are backed, or collateralized, by

pools of residential mortgage loans.  In order to induce investors to purchase the Certificates in

**PLAINTIFFS' ORIGINAL PETITION**                                                      **PAGE 1**

two securities offerings, Barclays made representations and assurances that it now admits were not only false, but in violation of express terms of the offering documents that were provided to Lone Star and other investors.

2.     LSF5, an affiliate of Lone Star Fund, a Texas-based private equity fund, purchased approximately $60 million in Certificates from Barclays.  Lone Star decided to purchase the Certificates from Barclays only after extensive one-on-one discussions and negotiations with Barclays in Texas in which Barclays repeatedly assured Lone Star regarding its "comprehensive" due diligence process and made representations as to the quality of the Certificates.

3.     In the offering materials, all of which were publicly filed with the U.S. Securities and Exchange Commission, Barclays represented that the collateral underlying the Certificates – pools of residential mortgage loans – was in good standing and that none of the mortgage loans in the pools had been delinquent from the time they were originated until the time of the Barclays' securities offerings.[1]  The quality of the underlying mortgage loans is of critical importance to investors in a mortgage-backed security because investment returns depend on the income stream generated by the timely payment of the underlying mortgage loan obligations.  In general, if a mortgage loan becomes delinquent, the cash available for distribution to investors is reduced or eliminated, materially affecting not only the income stream but also the value of the Certificates.

4.     Within months of purchasing the Certificates from Barclays, Lone Star discovered that, notwithstanding Barclays' representations and assurances, a material number of the mortgage loans underlying the Certificates purchased by Lone Star had been, in fact, delinquent

---

[1] Barclays' "no delinquency" representation was subject to certain exceptions, all of which involved loans that were listed on a schedule contained in the offering materials ("Excepted Loans").  LSF5's Petition does not pertain to the Excepted Loans.

**PLAINTIFFS' ORIGINAL PETITION**                                                    **PAGE 2**

as of the dates of the offerings.  As further described below, Lone Star purchased Certificates within a period of one month in two related offerings by Barclays – the "BR2" and "BR3" securities offerings.  Unbeknownst to Lone Star, the pool of mortgage loans underlying the BR2 securities offering (the "BR2 Loan Pool") and the pool of mortgage loans underlying the BR3 securities offering (the "BR3 Loan Pool"; together with the BR2 Loan Pool, the "Loan Pools") each contained a material number of delinquent loans at the time that Barclays sold them to Lone Star.  If Lone Star had known about these delinquencies in the Loan Pools, it would not have purchased the Certificates.

5.        Each and every document revealing the number of delinquencies in the Loan Pools was within Barclays' possession or under its control.  It is thus clear that Barclays knew that the representations in the offering materials were false, and Barclays used the Loan Pools and the BR2 and BR3 offerings as a place to unload troubled mortgage loans, all at Lone Star's expense.

6.        As a direct result of Barclays' wrongdoing, Lone Star has suffered – and continues to suffer – material financial harm and loss.

### III.        THE PARTIES

7.        Plaintiff Lone Star Fund is a limited partnership organized and existing under and by the laws of the State of Delaware, with its principal place of business in Dallas, Texas.  Lone Star Fund's limited partners include, among others, citizens of the States of Texas, New York, and Connecticut.  Lone Star Fund is an indirect owner of LSF5, and LSF5 holds investments for the benefit of the Lone Star Fund's limited partners.

8.        Plaintiff LSF5, an affiliate of Lone Star Fund, is a limited liability company organized, existing under, and by virtue of the laws of the State of Delaware, with its principal place of business in Hamilton, Bermuda.  LSF5 has seven corporate officers, six of whom reside

**PLAINTIFFS' ORIGINAL PETITION**                                                   **PAGE 3**

in the State of Texas.

9.      Defendant Barclays PLC is a public limited company registered in England and

Wales, with its registered head office in London, England.  Barclays PLC maintains a branch

office in New York, New York.  Barclays PLC is (1) the 100% owner of Barclays Capital, the

underwriter for the BR2 and BR3 securities offerings, (2) the administrator and affiliate of

Sutton Funding LLC ("Sutton"), which is the sponsor of the BR2 and BR3 securities offerings,

and (3) the 100% owner of Securitized Asset Backed Receivables LLC ("SABR"), the Depositor

of the mortgage loans into the BR2 and BR3 Trusts.  Barclays PLC may be served with process

by serving its registered agent for service of process, CT Corporation System, 350 North St. Paul

Street, Dallas, TX 75201.

10.     Defendant Barclays Capital is a corporation organized and existing under and by

virtue of the laws of the State of Connecticut, with its principal place of business in New York,

New York.  Barclays Capital is the investment banking division of Barclays PLC.  Barclays

Capital was the underwriter for the BR2 and BR3 securities offerings.  Barclays Capital may be

served with process by serving its registered agent for service of process, CT Corporation

System, 350 North St. Paul Street, Dallas, TX 75201.  In the alternative, Barclays Capital

engages in business in this State as provided in TEX. CIV. PRAC. & REM. CODE § 17.042 but has

not designated a resident agent for service of process.  As such, Barclays Capital may be served

with process by serving the Texas Secretary of State as its agent for service, with service to be

forwarded to Barclays Capital's home office and principal place of business, Barclays Capital

Inc., 200 Park Avenue, New York, New York 10166, as well as to its registered agent for service

of process in New York, CT Corporation System, 111 Eighth Avenue, New York, New York

10011.

## IV.    JURISDICTION AND VENUE

11.    This action arises under the Texas Securities Act, TEX. REV. CIV. STAT. ANN. ART. 581, § 33, TEX. BUS. & COM. CODE ANN. § 27.01, the common law of Texas, and the Securities Act of 1933, 15 U.S.C. §§ 77, *et seq.*

12.    Barclays' offer and sale of securities at issue herein was made to Lone Star in Texas. Barclays purposefully availed itself of the benefits and protections of the forum by, among other things, (a) regularly exchanging e-mail and telephone calls with Lone Star relating to the offer and sale of securities; (b) making an in-person visit and presentation to Lone Star in Dallas with regard to the offer and sale of these securities; and (c) causing Lone Star to suffer harm in Texas as a result of its tortious and fraudulent conduct. Accordingly, Barclays is subject to personal jurisdiction in Texas.

13.    Venue is proper in Dallas County pursuant to Section 15.002(a)(1) of the Texas CIVIL PRACTICE & REMEDIES CODE because all or a substantial part of the events or omissions giving rise to the claims occurred in Dallas County or, in the alternative, pursuant to Section 15.002(a)(4) because Lone Star Fund resided in Dallas County at the time the causes of action accrued. Specifically, Barclays' misrepresentations and solicitations were directed to Lone Star in Dallas, Texas, and Lone Star suffered harm in the State of Texas as a result of Defendants' tortious and fraudulent conduct.

14.    This action is not removable to federal court because (1) Lone Star asserts claims against Defendants under the Securities Act of 1933, which provides that "no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States," 15 U.S.C. § 77v(a); and (2) there is no diversity of citizenship for purposes of diversity jurisdiction under 28 U.S.C. § 1332 because (a) Plaintiff Lone Star Fund is a citizen for diversity purposes of, among other states, New York and Connecticut, by virtue of

**PLAINTIFFS' ORIGINAL PETITION**                                                    **PAGE 5**

the fact that at least one of its limited partners is a citizen of New York and at least one of its

limited partners is a citizen of Connecticut, and (b) Defendant Barclays Capital is also a citizen

of New York and Connecticut because its principal place of business is New York and it is

incorporated in Connecticut.

## V.     FACTUAL BACKGROUND

### Barclays Structured and Marketed the BR2 and BR3 Securities Offerings

15.     The Certificates are commonly known as mortgage-backed securities. In general,

mortgage-backed securities are financial instruments that are created by pooling and securitizing

mortgage loans. The issuer of the mortgage-backed securities acquires an inventory of mortgage

loans, and then sells rights to the cash flows from the mortgage loans to investors. The rights to

the cash flows are divided into various layers or tranches in accordance with the expected cash

flows and risks associated with the mortgage-backed securities.

16.     The assets underlying the Certificates sold to Lone Star by Barclays are mortgage

loans secured by first- or second-lien mortgages or deeds of trust on residential real estate in the

U.S. (the "Mortgage Loans"). Defendant Barclays PLC, through its affiliate, purchased the

underlying Mortgage Loans from two residential mortgage loan originators.

17.     Barclays arranged for the creation of two trusts (the "BR2 Trust" and the "BR3

Trust") to hold the Mortgage Loans and issue the Certificates. Barclays, through its affiliates,

created pools of Mortgage Loans and transferred them to the BR2 and BR3 Trusts, which in turn

issued the Certificates.

18.     Barclays Capital underwrote both the BR2 and BR3 securities offerings. As

underwriter, Barclays Capital caused the BR2 and BR3 Trusts to be established, developed the

offering documents, marketed the offerings, solicited investors, and priced the Certificates.

Barclays Capital arranged the types of securities that comprised the tranches of the BR2 and BR3

Certificates and structured the risk profile for each tranche.

19.     Barclays Capital was responsible for preparing the Prospectus dated December 11, 2006 relating to both the BR2 and BR3 securities offerings (the "Prospectus"), as well as the Prospectus Supplement dated May 16, 2007 relating to the BR2 securities offering (the "BR2 Supplemental Prospectus") and the Prospectus Supplement dated June 16, 2007 relating to the BR3 securities offering (the "BR3 Supplemental Prospectus"; collectively with the BR2 Supplemental Prospectus, the "Supplemental Prospectuses").

20.     The Supplemental Prospectuses each provided that Barclays PLC would represent and warrant that, as of the Closing Dates for the BR2 and BR3 securities offerings (which were May 17, 2007 for the BR2 offering, and June 13, 2007 for the BR3 offering), none of the relevant Mortgage Loans were or ever had been delinquent.  Barclays did in fact provide such representations in two substantively identical documents (the "Barclays Representations"), which were presented to investors with the intent that they be relied upon.  Each of these Barclays Representations contains substantially identical language and represents that none of the Mortgage Loans in the Loan Pools were delinquent, nor had any ever been delinquent, as of the Closing Date.

21.     Barclays Capital, as underwriter, sold approximately $60 million in Certificates to Lone Star.  Lone Star purchased approximately $45 million in BR2 Certificates in a private placement in May 2007.  Lone Star purchased approximately $15.8 million in BR3 Certificates in the public offering pursuant to the BR3 Supplemental Prospectus in June 2007.

<div align="center">

**Barclays Misrepresented That No Mortgage Loans**
**Were Delinquent as of the Closing Date**

</div>

22.     As set forth above, Barclays represented that none of the Mortgage Loans underlying the BR2 and BR3 securities offering were delinquent, nor had any ever been

delinquent, as of the Closing Dates.  Barclays made these representations intending and enabling that investors such as Lone Star would rely on them.

23.     In fact, Barclays knew at the time of the BR2 securities offering, or recklessly disregarded the fact that a significant number of loans in the BR2 Loan Pool had been delinquent for 30 days or more at some point prior to the Closing Date, defined as May 17, 2007.

24.     Furthermore, Barclays knew at the time of the BR3 securities offering, or recklessly disregarded the fact that a significant number of loans in the BR3 Loan Pool had been delinquent for 30 days or more at some point prior to the Closing Date, defined as June 13, 2007.

**In Soliciting Lone Star to Purchase the Certificates,**
**Barclays Touted the Due Diligence It Had Purportedly Performed on the Underlying**
**Mortgage Loan Pools.**

25.     In March 2007, Barclays Capital began discussions with Lone Star regarding potential investment opportunities in the mortgage securitization market.  The discussions with Barclays Capital took place primarily either in Dallas, Texas, or telephonically with Lone Star participating in Dallas.

26.     On or about March 6, 2007, representatives of Barclays Capital met with Lone Star in Dallas to discuss potential investment opportunities for Lone Star in mortgage-backed securities.

27.     Throughout March and April 2007, Barclays presented Lone Star with a variety of investment opportunities in the secondary market for mortgage loans.  The discussions between Barclays and Lone Star focused on mortgage-backed securities offerings by Barclays. In these discussions, Lone Star repeatedly asked Barclays about the completeness and accuracy of Barclays' diligence and underwriting procedures on the underlying Mortgage Loans.

28.     Barclays Capital represented to Lone Star, among other things, that it was

comprehensive and complete in its underwriting and diligence.

29.     The Prospectus Supplements also stated that Barclays performed extensive diligence on the Mortgage Loans.

30.     The marketing, diligence and offering materials provided to Lone Star by Barclays concealed the fact that a significant number of the Mortgage Loans had been delinquent as of the Closing Dates.

### Lone Star Purchased Certificates in the BR2 and BR3 Offerings in Reliance on Barclays' Misrepresentations

31.     On or about May 16, 2007, Lone Star paid Barclays $45,338,000.00 for Certificates issued in the BR2 securities offering.  On or about May 17, 2007, Lone Star wired payment for the purchase of the BR2 Certificates from an account at JP Morgan Chase in Houston, Texas to Barclays in New York.

32.     On or about June 7, 2007, Lone Star paid Barclays $15,871,517.30 for Certificates issued in the BR3 securities offering.  On or about June 7, 2007, Lone Star wired payment for the purchase of the Class B-3 Certificates from an account at JP Morgan Chase in Houston, Texas to Barclays in New York.

33.     Lone Star relied on Barclays' representations regarding the diligence it purportedly conducted on the underlying Mortgage Loans in purchasing the BR2 and BR3 Certificates and on Barclays' representations that none of the Mortgage Loans underlying the Certificates were delinquent or had ever been delinquent prior to the Closing Date.  But for Barclays' representations and assurances that it had conducted comprehensive diligence and that the Mortgage Loans had not been delinquent from inception until the Closing Dates, Lone Star would not have purchased the BR2 or BR3 Certificates.  Barclays knew that Lone Star was in the limited class of persons who would rely on their representations.

34.     When the BR2 and BR3 Certificates were purchased, Lone Star did not know, nor did they have any reason to suspect, that Barclays' statements were false and misleading. Lone Star was misled by the Prospectus, the Prospectus Supplements, the Barclays Representations, and otherwise by Barclays' representations to Lone Star, including the representations regarding the diligence conducted on the underlying Loan Pools and the representations that the Mortgage Loans had not been delinquent from loan inception until the Closing Dates. Had Lone Star known the truth, Lone Star would not have purchased the BR2 or BR3 Certificates.

### Lone Star Discovered, after Purchasing the Certificates, That Barclays' Representations Were False

35.     The June 2007 Trustee report for the BR2 Trust disclosed that a significant number of the Mortgage Loans in the BR2 Loan Pool were delinquent for 60 days. As a result, Lone Star began inquiring of the Trustee, the Servicer, and Barclays regarding delinquencies in the BR2 Loan Pool.

36.     Lone Star received materials from the Trustee, the Servicer, and Barclays and undertook an analysis of the payment and default histories for certain Mortgage Loans in both the Loan Pools. Based upon this analysis, Lone Star learned that a significant number of the Mortgage Loans underlying the BR2 Certificates and BR3 Certificates had been delinquent as of the relevant Closing Date, notwithstanding the representations and assurances of Barclays to the contrary. Lone Star informed Barclays of the results of its analysis, and Barclays admitted that a significant number of Mortgage Loans underlying the BR2 Certificates had been delinquent prior to the relevant Closing Date. Barclays has refused to provide Lone Star any additional information requested by Lone Star regarding the Mortgage Loans.

37.     Barclays knew that the delinquency representations contained in the Barclays Representations and the representations regarding its due diligence in underwriting these

transactions were false when they were made.  Barclays and/or its affiliates and agents had access to all of the loan payment information with respect to both the BR2 and BR3 Trusts prior to their Closing Dates and prior to the dates when the misrepresentations were made to Lone Star.

38.     Barclays knew or should have known that Lone Star would rely on, among other things, the information in the Prospectus, the Prospectus Supplements, and the Barclays Representations when purchasing the Certificates.

39.     Had Barclays properly identified and disclosed to Lone Star the number of Mortgage Loans that had been delinquent prior to the Closing Date, and the deficiencies in its own due diligence, Lone Star would not have purchased the BR2 or BR3 Certificates.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of the TEXAS SECURITIES ACT, TEXAS CIVIL STATUTE ARTICLE 581, Section 33A**

40.     Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.

41.     Barclays offered and sold the BR2 and BR3 Certificates to investors, including Lone Star.  In doing so, Barclays defrauded Lone Star, made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

42.     Barclays made or omitted to make statements with a reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of the BR2 and BR3 Certificates. Barclays' misrepresentations: (i) deceived Lone Star that no Mortgage Loans were delinquent as of the Closing Dates; (ii) artificially inflated and maintained the price of the Certificates; (iii) caused Lone Star to purchase the Certificates at artificially inflated prices; and (iv) deprived Lone Star of the expected return on its investment.

43.     In the Barclays Representations, Barclays PLC represented that:

> (i) All payments required to be made up to the Closing Date for the Mortgage Loan under the terms of the Mortgage Note, other than payments not yet 30 days delinquent, have been made and credited, (ii) no payment required under the Mortgage Loan has been 30 days or more delinquent at any time since the origination of the Mortgage Loan, and (iii) the first Monthly Payment was made with respect to the Mortgage Loan on its related Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note.

44.     Barclays misrepresented that it had conducted thorough due diligence on the Mortgage Loans in the BR2 and BR3 Loan Pools.

45.     The foregoing representations were false at the time they were made and Barclays knew the representations were false.

46.     These misrepresentations were material to Lone Star in deciding to invest in the Certificates.

47.     As a direct and proximate result of Barclays' wrongful conduct, Barclays caused Lone Star to incur substantial monetary damages.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Violation of the TEXAS SECURITIES ACT, TEXAS CIVIL STATUTE ARTICLE 581, Section 33F

48.     Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.

49.     Barclays Capital violated the Texas Securities Act by selling Certificates to Lone Star by virtue of false and misleading statements of material fact.

50.     Barclays PLC directly and indirectly, with intent to deceive or defraud or with reckless disregard for the truth or the law, materially aided Barclays Capital in the fraudulent sale of the Certificates.  In doing so, Barclays PLC materially aided Barclays Capital in making untrue statements of material fact and omitting material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

51.     Barclays PLC knew, or acted with reckless disregard for the truth in not knowing, that Barclays Capital's representations regarding the quality of the Loan Pools were false.

52.     Barclays PLC  purchased the Mortgage Loans from the loan originators.  Thus, Barclays PLC had knowledge regarding the delinquency status of the Mortgage Loans but failed to correct its statements to investors prior to the purchase of the Certificates by investors from Barclays Capital.

53.     Barclays made or omitted to make statements with a reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of the BR2 and BR3 Certificates.  Barclays' misrepresentations were intended to and did:  (i) deceive Lone Star that no Mortgage Loans were delinquent as of the Closing Dates; (ii) artificially inflate and maintain the price of the Certificates; (iii) cause Lone Star to purchase the Certificates at artificially inflated prices; and (iv) deprive Lone Star of the expected return on its investment.

54.     In the Barclays Representations, Barclays PLC represented that:

(i) All payments required to be made up to the Closing Date for the Mortgage Loan under the terms of the Mortgage Note, other than payments not yet 30 days delinquent, have

been made and credited, (ii) no payment required under the Mortgage Loan has been 30 days or more delinquent at any time since the origination of the Mortgage Loan, and (iii) the first Monthly Payment was made with respect to the Mortgage Loan on its related Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note.

55.     Barclays PLC's representations were false at the time they were made and Barclays PLC knew the representations were false or acted with reckless disregard for the truth in not knowing that its statements were false.

56.     Plaintiff Lone Star reasonably and justifiably relied on Barclays PLC's misrepresentations in deciding to purchase the BR2 and BR3 Certificates from Barclays Capital.

57.     Lone Star would not have purchased the Certificates if: (a) Barclays PLC had not represented that it had reviewed each loan file as part of its due diligence; and (b) the Prospectus Supplements and the Pooling Agreements had accurately stated the status of the Mortgage Loans as of the Closing Dates.

58.     As a direct and proximate result of Barclays PLC's aiding and abetting Barclays Capital's fraud, Lone Star has suffered damages.

## THIRD CAUSE OF ACTION

### Control Person Liability for Violation of the TEXAS SECURITIES ACT, TEXAS CIVIL STATUTE ARTICLE 581, Section 33F

59.     Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein. This cause of action is asserted against Barclays PLC.

60.     Barclays PLC exercised active control over the day-today affairs of Barclays Capital and had the power to influence or control the transactions that gave rise to violations of the Texas Securities Act alleged above. As such, Barclays PLC is a controlling person of Barclays Capital and is jointly and severally liable to Lone Star.

61.     As a direct and proximate result of Barclays PLC's acts, Lone Star has suffered

**PLAINTIFFS' ORIGINAL PETITION**                                    **PAGE 14**

damages.

<h1 align="center">FOURTH CAUSE OF ACTION</h1>

<p align="center">Violation of Section 27.01 of the TEXAS BUSINESS AND COMMERCE CODE</p>

62.     Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.

63.     Barclays directly and indirectly engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lone Star, made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

64.     Barclays made or omitted to make statements with a reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of the BR2 Certificates and the BR3 Certificates.  Barclays' misrepresentations were intended to and did:  (i) deceive Lone Star that no Mortgage Loans were delinquent as of the Closing Dates; (ii) artificially inflate and maintain the price of the Certificates; (iii) cause Lone Star to purchase the Certificates at artificially inflated prices; and (iv) deprive Lone Star of the expected return on its investment.

65.     In the Barclays Representations, Barclays PLC represented that:

(i) All payments required to be made up to the Closing Date for the Mortgage Loan under the terms of the Mortgage Note, other than payments not yet 30 days delinquent, have been made and credited, (ii) no payment required under the Mortgage Loan has been 30 days or more delinquent at any time since the origination of the Mortgage Loan, and (iii) the first Monthly Payment was made with respect to the Mortgage Loan on its related Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note.

66.     Barclays knew the foregoing representations were false or made the representations with reckless disregard for the truth.

67.     Barclays made the foregoing misrepresentations and/or omissions with the intent

to induce purchasers of the Certificates.

68.     Lone Star reasonably and justifiably relied on Defendants' misrepresentations in deciding to purchase the BR2 and BR3 Certificates.

69.     Lone Star would not have purchased the Certificates if: (a) Barclays had not represented in its marketing materials that it had reviewed each loan file as part of its due diligence; or (b) the Prospectus Supplements and the Pooling Agreements had accurately stated the status of the loans as of the Closing Dates.

70.     As a direct and proximate result of Barclays' wrongful conduct, Barclays caused Lone Star to incur substantial monetary damages.

### FIFTH CAUSE OF ACTION

### Aiding and Abetting Violation of the TEXAS BUS. & COM. CODE, Section 27.01

71.     Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.

72.     Barclays PLC directly and indirectly, with intent to deceive or defraud or with reckless disregard for the truth or the law, materially aided Barclays Capital in the fraudulent sale of the Certificates. In doing so, Barclays PLC materially aided Barclays Capital in making untrue statements of material fact and omitting material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

73.     Barclays PLC knew, or acted with reckless disregard for the truth in not knowing, that Barclays Capital's representations regarding the quality of the Loan Pools were false.

74.     Barclays PLC purchased the Mortgage Loans from loan originators. Thus, Barclays PLC had knowledge regarding the delinquency status of the Mortgage Loans but failed

to correct its statements to investors prior to the purchase of the Certificates by investors from

Barclays Capital.

75.    Barclays made or omitted to make statements with a reckless disregard for the

truth and employed devices and artifices to defraud in connection with the purchase and sale of

the BR2 and BR3 Certificates.  Barclays' misrepresentations were intended to and did:  (i)

deceive Lone Star that no Mortgage Loans underlying the Certificates were delinquent as of the

Closing Dates; (ii) artificially inflate and maintain the price of the Certificates; (iii) cause Lone

Star to purchase the Certificates at artificially inflated prices; and (iv) deprive Lone Star of the

expected return on its investment.

76.    In the Barclays Representations, Barclays PLC represented that:

(i) All payments required to be made up to the Closing Date for the Mortgage Loan under
the terms of the Mortgage Note, other than payments not yet 30 days delinquent, have
been made and credited, (ii) no payment required under the Mortgage Loan has been 30
days or more delinquent at any time since the origination of the Mortgage Loan, and (iii)
the first Monthly Payment was made with respect to the Mortgage Loan on its related
Due Date or within the grace period, all in accordance with the terms of the related
Mortgage Note.

77.    Barclays PLC's representations were false at the time they were made and

Barclays PLC knew the representations were false or acted with reckless disregard for the truth

in not knowing that its statements were false.

78.    Plaintiff Lone Star reasonably and justifiably relied on Barclays PLC's

misrepresentations in deciding to purchase the BR2 and BR3 Certificates from Barclays Capital.

79.    Lone Star would not have purchased the Certificates if:  (a) Barclays PLC had not

represented that it had reviewed each loan file as part of its due diligence; and (b) the Prospectus

Supplements and the Pooling Agreements had accurately stated the status of the Mortgage Loans

as of the Closing Dates.

80.    Barclays PLC benefited from Defendant Barclays Capital's material

**PLAINTIFFS' ORIGINAL PETITION**                                                            **PAGE 17**

misrepresentations.

81.     As a direct and proximate result of Barclays PLC's aiding and abetting Barclays

Capital's fraud, Lone Star has suffered damages.

## SIXTH CAUSE OF ACTION

### Common Law Fraud

82.     Lone Star hereby realleges and incorporates all paragraphs above as if set forth in

full herein.

83.     As detailed above, Barclays intentionally made false and misleading statements

and/or material omissions of fact to Lone Star in connection with their purchase of Certificates.

84.     Barclays knew the representations were false at the time they were made.

85.     Such statements of fact were material to Lone Star in its decision to purchase the

Certificates.

86.     Lone Star reasonably relied upon Barclays' materially false and misleading

misrepresentations and/or material omissions of fact.

87.     Barclays intended that Lone Star would act on its misrepresentations and purchase

the Certificates.

88.     Lone Star was damaged as a result of Barclays' materially false and misleading

statements and/or material omissions of fact.

## SEVENTH CAUSE OF ACTION

### Negligent Misrepresentation

89.     Lone Star hereby realleges and incorporates all paragraphs above as if set forth in

full herein.

90.     As detailed above, Barclays made false and misleading statements and/or material

omissions of fact to Lone Star in connection with their purchase of Certificates.

**PLAINTIFFS' ORIGINAL PETITION**                                              **PAGE 18**

91.     Barclays PLC and Barclays Capital made such misrepresentation in the course of the BR2 and BR3 securities offerings.

92.     Barclays PLC and Barclays Capital had pecuniary interests in the BR2 and BR3 securities offerings.

93.     Such statements of fact were made to Lone Star with the intent that they would rely on them.

94.     Lone Star reasonably and justifiably relied upon Barclays' materially false and misleading misrepresentations and/or material omissions of fact.

95.     Barclays PLC and Barclays Capital knew, or in the exercise of reasonable care should have known, that their representations were false.

96.     Lone Star was damaged as a result of Barclays' materially false and misleading statements and/or material omissions of fact.

97.     Lone Star was in the limited class of persons Barclays knew would rely on its representations.

## EIGHTH CAUSE OF ACTION

### Violation of Section 12(a)(2) of the Securities Act of 1933

98.     Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.

99.     Barclays Capital directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or the mails, offered and sold the BR3 Certificates to investors by means of a prospectus and oral communications.  In doing so, Barclays defrauded Lone Star, made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and

false.

100.    Barclays Capital made or omitted to make statements with a reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of the BR3 Certificates. Barclays Capital's misrepresentations were intended to and did: (i) deceive Lone Star that no Mortgage Loans were delinquent as of the Closing Date; (ii) artificially inflate and maintain the price of the Certificates; (iii) cause Lone Star to purchase the Certificates at artificially inflated prices; and (iv) deprive Lone Star of the expected return on its investment.

101.    The Prospectus Supplement through which the BR3 Certificates were offered provides that:

> Pursuant to the representations and warranties agreement (the "Barclays Representation Agreement"), Barclays will make representations and warranties with respect to each mortgage loan NC Capital sold to the sponsor as of the closing date . . . , including but not limited to:
>
> (1) As of the servicing transfer date, except with respect to the Delinquent mortgage loans described under "The Mortgage Loan Pool – General" in this prospectus supplement, no payment required under the mortgage loan is 30 days or more Delinquent nor has any payment under the mortgage loan been 30 days or more Delinquent at any time since the origination of the mortgage loan.

102.    In the BR3 Barclays Representations, Barclays PLC represented that:

> All payments required to be made up to the Closing Date for the Mortgage Loan under the terms of the Mortgage Note, other than payments not yet 30 days delinquent, have been made and credited, (ii) no payment required under the Mortgage Loan has been 30 days or more delinquent at any time since the origination of the Mortgage Loan, and (iii) the first Monthly Payment was made with respect to the Mortgage Loan on its related Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note.

103.    The foregoing representations were false at the time they were made and Barclays Capital knew the representations were false or made the representations with reckless disregard to the truth.

104.    Barclays Capital made the foregoing misrepresentations and/or omissions with the intent to influence purchasers of the Certificates.

105.    Lone Star reasonably and justifiably relied on the misrepresentations made by Defendants, or the misrepresentations Barclays Capital made by omission, in deciding to purchase the BR3 Certificates.

106.    Barclays Capital actively solicited Lone Star's investment in the BR3 securities offering with a motivation to serve its own financial interests.

107.    Lone Star purchased the BR3 Certificates from Barclays Capital, as underwriter.

108.    Barclays Capital earned substantial underwriting fees for underwriting the BR3 securities offering.

109.    Lone Star would not have purchased the Certificates if:  (a) Barclays Capital had not represented that it had reviewed each loan file as part of its due diligence; and (b) the Prospectus Supplement and the BR3 Pooling Agreement had accurately stated the status of the Mortgage Loans as of the Closing Dates.

110.    As a direct and proximate result of Barclays' wrongful conduct, Defendant Barclays Capital has caused Lone Star to incur substantial monetary damages.  The performance of that portion of the BR3 Loan Pool that was, or had been, delinquent at the time the BR2 securities offering closed is materially poorer than the performance of the BR3 Loan Pool that was not, nor had ever been, delinquent at the time of the BR3 securities offerings, resulting in fewer distributions to Lone Star.

## NINTH CAUSE OF ACTION

### Violation of Section 11 of the Securities Act of 1933

111.    Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.

**PLAINTIFFS' ORIGINAL PETITION**                                    **PAGE 21**

112.    Barclays Capital directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or the mails, offered and sold the BR3 Certificates to investors by means of a prospectus.  In doing so, Barclays Capital defrauded Lone Star, made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

113.    Barclays Capital made or omitted to make statements with a reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of the BR3 Certificates.  Barclays Capital's misrepresentations were intended to and did:  (i) deceive Lone Star that no Mortgage Loans were delinquent as of the Closing Date; (ii) artificially inflate and maintain the price of the Certificates; (iii) cause Lone Star to purchase the Certificates at artificially inflated prices; and (iv) deprive Lone Star of the expected return on its investment.

114.    The Prospectus Supplement through which the BR3 Certificates were offered provides that:

> Pursuant to the representations and warranties agreement (the "Barclays Representation Agreement"), Barclays will make representations and warranties with respect to each mortgage loan NC Capital sold to the sponsor as of the closing date . . . , including but not limited to:
>
> (1)  As of the servicing transfer date, except with respect to the Delinquent mortgage loans described under "The Mortgage Loan Pool – General" in this prospectus supplement, no payment required under the mortgage loan is 30 days or more Delinquent nor has any payment under the mortgage loan been 30 days or more Delinquent at any time since the origination of the mortgage loan.

115.    In the BR3 Barclays Representations, Barclays PLC represented that:

> All payments required to be made up to the Closing Date for the Mortgage Loan under the terms of the Mortgage Note, other than payments not yet 30 days delinquent, have been made and credited, (ii) no payment required under the Mortgage Loan has been 30 days or more delinquent at any time since the origination of the Mortgage Loan, and (iii) the first Monthly Payment was made

with respect to the Mortgage Loan on its related Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note.

116.    The foregoing representations were false at the time they were made and Barclays Capital knew the representations were false or made the representations with reckless disregard to the truth.

117.    Barclays Capital made the foregoing misrepresentations and/or omissions with the intent to influence purchasers of the Certificates.

118.    Plaintiff Lone Star reasonably and justifiably relied on the misrepresentations made by Defendants, or the misrepresentations Barclays Capital made by omission, in deciding to purchase the BR3 Certificates.

119.    Barclays Capital actively solicited Lone Star's investment in the BR3 securities offering with a motivation to serve its own financial interests.

120.    Lone Star purchased the BR3 Certificates from Barclays Capital, as underwriter.

121.    Barclays Capital earned substantial underwriting fees for underwriting the BR3 securities offering.

122.    Lone Star would not have purchased the Certificates if: (a) Barclays Capital had not represented that it had reviewed each loan file as part of its due diligence; and (b) the Prospectus Supplement and BR3 Pooling Agreement had accurately stated the status of the Mortgage Loans as of the Closing Dates.

123.    As a direct and proximate result of Barclays Capital's wrongful conduct, Defendant Barclays Capital has caused Lone Star to incur substantial monetary damages.  The performance of that portion of the BR3 Loan Pool that was delinquent at the time the securities offering closed is materially poorer than the performance of the BR3 Loan Pool that was not delinquent at the time of the BR3 securities offerings, resulting in fewer distributions to Lone

Star.

## **TENTH CAUSE OF ACTION**

### **Control Person Liability – Section 15 of the Securities Act of 1933**

124.    Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.  This cause of action is asserted against Barclays PLC for violation of Section 15 of the Securities Act of 1933.

125.    By reason of its ownership of Barclays Capital, Barclays PLC had the power, and exercised such power, to control the acts and representations of Barclays Capital alleged above.  Barclays PLC was a culpable participant in the violations of the Securities Act alleged above.

126.    As such, Barclays PLC is a controlling person of Barclays Capital and is jointly and severally liable to Lone Star.

127.    As a direct and proximate result of Barclays PLC's acts, Lone Star has suffered damages.

## **VII.    DAMAGES**

128.    Based on the wrongful conduct of Defendants, Lone Star has suffered actual damages in excess of the minimum jurisdictional limits of this court.  In addition, Lone Star is entitled to exemplary damages, attorneys' fees, pre-judgment and post-judgment interest, and all other damages to which it may be entitled under the law.

## **VIII.   REQUEST FOR DISCLOSURE**

129.    Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Defendants are requested to disclose the information or material described in Rule 194.2.

## **IX.    PRAYER FOR JUDGMENT AND RELIEF**

WHEREFORE, Lone Star respectfully requests that the Court enter a judgment in its favor for:

**PLAINTIFFS' ORIGINAL PETITION**                                    **PAGE 24**

i.    rescission of the purchase of the Certificates, and requiring Barclays to make restitution and repay to Lone Star the approximately $60 million consideration paid in connection therewith;

ii.   in the alternative, damages on the purchase of the Certificates in an amount to be determined at trial;

iii.  exemplary damages;

iv.   an award of pre-judgment interest at the maximum rate allowable by law;

v.    an award of the costs, disbursements, and experts' fees of this action;

vi.   an award of attorneys' fees; and

vii.  any further relief deemed just and proper.

## X.   DEMAND FOR JURY TRIAL

As to all Causes of Action, where applicable, Plaintiffs hereby demand a trial by jury.


VINSON & ELKINS L.L.P.


By: _Karl Hisc_____
       Karen L. Hirschman
       State Bar No. 09721500
       Matthew W. Moran
       State Bar No. 24002642

Trammell Crow Center
2001 Ross Avenue
Suite 3700
Dallas, Texas 75201-2975

Kenneth P. Held
State Bar No. 26030333
VINSON & ELKINS L.L.P.
First City Tower
1001 Fannin Street
Suite 2500
Houston, Texas 77002-6760

ATTORNEYS FOR PLAINTIFFS
LONE STAR FUND V (U.S.), L.P. AND
LSF5 BOND HOLDINGS, LLC

Of Counsel:

Craig A. Newman
Patricia C. O'Prey
RICHARDS KIBBE & ORBE LLP
One World Financial Center
New York, New York 10281
(212) 530-1800


Dallas 1354474v.1

**PLAINTIFFS' ORIGINAL PETITION**                        **PAGE 26**

FORM NO. 353-3 – CITATION

# THE STATE OF TEXAS

**CITATION**

No.: **DC-08-00398**

**LONE STAR FUND V (US) LP ETAL**

**vs.**

**BARCLAYS BANK PLC ETAL**

To:

**BARCLAYS BANK PLC**
**BY SERVING ITS REGISTERED AGENT CT CORPORATION SYSTEM**
**350 NORTH ST PAUL STREET**
**DALLAS TX 75201**

GREETINGS:

You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10 o'clock a.m. of the Monday next following the expiration of twenty  days after you were served this citation and  petition, a default judgment may be taken against you.    Your answer should be addressed to the clerk of the **95th District Court** at 600 Commerce Street, Dallas, Texas 75202.

Said Plaintiff being **LONE STAR FUND V (US) LP**

Filed in said Court  **on this the 14th day of January, 2008** against

**BARCLAYS BANK PLC AND BARCLAYS CAPITAL INC**

For suit, said suit being numbered **DC-08-00398**  the nature of which demand is as follows: Suit On **COMMERCIAL DISPUTE** etc. as shown on said petition **REQUEST FOR PRODUCTION OF DOCUMENTS FROM BARCLAYS BANK PLC AND BARCLAYS CAPITAL INC**, a copy of which accompanies this citation.    If this citation is not served,  it  shall be returned unexecuted.

WITNESS: GARY FITZSIMMONS, Clerk of the District Courts of Dallas, County Texas.

Given under my name and the Seal of said Court at office on this  **14th day of January, 2008**

ISSUED
**on this the 14th day of January, 2008**

GARY FITZSIMMONS
Clerk District Courts,
Dallas County, Texas

By  **RITA RODGERS**, Deputy

Attorney for Plaintiff

**KAREN LEE HIRSCHMAN**
**VINSON & ELKINS LLP**
**2001 ROSS AVENUE SUITE 3700**
**DALLAS, TX  75201**
**212-530-1800**

ATTEST: GARY FITZSIMMONS
Clerk of the District Courts of Dallas, _____, Deputy

By _____

ATTY

B

# CASE SUMMARY
## CASE NO. DC-08-00398

| | | |
|---|---|---|
| LONE STAR FUND V (US) LP et al<br>vs.<br>BARCLAYS BANK PLC et al | §<br>§<br>§<br>§ | Location: **95th District Court**<br>Judicial Officer: **JOHNSON, KAREN**<br>Filed on: **01/14/2008** |

### CASE INFORMATION

Case Type: **COMMERCIAL DISPUTE**
Sub Type: **SECURITIES/STOCK**

### PARTY INFORMATION

| | | Lead Attorneys |
|---|---|---|
| **PLAINTIFF** | **LONE STAR FUND V (US) LP** | **HIRSCHMAN, KAREN LEE** 214-220-7795<br>*Retained* |
| | **LSF5 BOND HOLDINGS LLC** | |
| **DEFENDANT** | **BARCLAYS BANK PLC** | |
| | **BARCLAYS CAPITAL INC** | |

| DATE | EVENTS & ORDERS OF THE COURT | INDEX |
|---|---|---|
| 01/14/2008 | ORIGINAL PETITION (OCA) | |
| 01/14/2008 | ISSUE CITATION | |
| 01/14/2008 | ISSUE CITATION | |
| 01/14/2008 | ISSUE CITATION COMM OF INS OR SOS | |
| 01/14/2008 | **CITATION**<br>BARCLAYS BANK PLC    served 01/15/2008<br>*1CIT-ATTY BARCLAYS BANK* | |
| 01/14/2008 | **CITATION**<br>BARCLAYS CAPITAL INC    served 01/15/2008<br>*1 CIT-ATTY, BARCLAY CAPITAL* | |
| 01/14/2008 | **CITATION SOS/COI/COH/HAG**<br>BARCLAYS CAPITAL INC    unserved<br>*1 CIT BARCLAY CAPITAL-ATTY* | |
| 01/14/2008 | JURY DEMAND (OCA)<br><br>   Party: PLAINTIFF LONE STAR FUND V (US) LP | *Vol./Book J24, Page192, 1 pages* |
| 02/13/2008 | RULE 11 | |

| DATE | FINANCIAL INFORMATION | |
|---|---|---|
| | **PLAINTIFF** LONE STAR FUND V (US) LP | |
| | Total Charges | 280.00 |
| | Total Payments and Credits | 280.00 |
| | **Balance Due as of 2/13/2008** | **0.00** |

**GARY FITZSIMMONS, DISTRICT CLERK**

**CASE SUMMARY**

**CASE NO. DC-08-00398**

| | | | | |
|---|---|---|---|---|
| 01/14/2008 | Charge | | PLAINTIFF LONE STAR FUND V (US) LP | 222.00 |
| 01/14/2008 | Charge | | PLAINTIFF LONE STAR FUND V (US) LP | 24.00 |
| 01/14/2008 | PAYMENT (CASE FEES) | Receipt # 2369-2008-DCLK | PLAINTIFF LONE STAR FUND V (US) LP | (268.00) |
| 01/14/2008 | Adjustment | | PLAINTIFF LONE STAR FUND V (US) LP | (24.00) |
| 01/14/2008 | Charge | | PLAINTIFF LONE STAR FUND V (US) LP | 28.00 |
| 01/14/2008 | Charge | | PLAINTIFF LONE STAR FUND V (US) LP | 30.00 |
| 01/14/2008 | PAYMENT (CASE FEES) | Receipt # 2394-2008-DCLK | PLAINTIFF LONE STAR FUND V (US) LP | (12.00) |

*Printed on 02/13/2008 at 10:55 AM*



**JACKSON WALKER L.L.P.**

ATTORNEYS & COUNSELORS

Mark T. Josephs
(214) 953-6009 (Direct Dial)
(214) 661-6651 (Direct Fax)
mjosephs@jw.com

February 1, 2008

**VIA TELECOPIER**

Mr. Matthew W. Moran
Vinson & Elkins L.L.P.
Trammell Crow Center
2001 Ross Ave., Suite 3700
Dallas, Texas 75201-2975

Re:   Lone Star Fund V (U.S.), L.P. and LSF5 Bond Holdings, LLC v. Barclays
Bank PLC, et al.; Cause No. 08-00398-D

Dear Matt:

This letter will confirm our conversation in which you agreed, on behalf of the plaintiffs in the captioned matter, to a ten day extension for the defendants to respond to the petition on file in the case. Under our agreement, defendants Barclays Bank plc and Barclays Capital Inc. will respond on or before February 14, 2008. Please indicate your written consent to this agreement by signing the space below and returning an executed original to me for filing with the court.

Thank you for your cooperation in this regard. Should you have any questions, please do not hesitate to contact me.

Sincerely,

Mark T. Josephs

MTJ:hkm
Enclosure

FILED
08 FEB 13  AM 10: 46
GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO., TEXAS

_____ DEPUTY

Mr. Matthew W. Moran
February 1, 2008
Page 2


AGREED:

VINSON & ELKINS, L.L.P.
Vinson & Elkins L.L.P.
Trammell Crow Center
2001 Ross Ave., Suite 3700
Dallas, Texas 75201-
Telephone:    (214) 220-7723
Telecopier:    (214) 999-7723


By: _____
       Matthew W. Moran
       State Bar No. 24002642


ATTORNEYS FOR PLAINTIFFS
LONE STAR FUND V (U.S.), L.P.
AND LSF5 BOND HOLDINGS, LLC



**EXECUTION COPY**

SUTTON FUNDING LLC,

Purchaser

NC CAPITAL CORPORATION,
Seller

AMENDED AND RESTATED MORTGAGE LOAN PURCHASE AGREEMENT

Dated as of June 1, 2006

# TABLE OF CONTENTS

<u>Page</u>

## ARTICLE I

### DEFINITIONS

Section 1.01  Defined Terms. ................................................................................... 1

## ARTICLE II

### AGREEMENT TO PURCHASE

Section 2.01  Agreement to Purchase. ..................................................................... 14

## ARTICLE III

### MORTGAGE SCHEDULES

Section 3.01  Preliminary Mortgage Schedule. ....................................................... 14
Section 3.02  Delivery of Mortgage Loan Schedule. .............................................. 14

## ARTICLE IV

### PURCHASE PRICE

Section 4.01  Purchase Price. ................................................................................... 15

## ARTICLE V

### EXAMINATION OF MORTGAGE FILES

Section 5.01  Examination of Mortgage Files. ........................................................ 15

## ARTICLE VI

### CONVEYANCE FROM SELLER TO PURCHASER

Section 6.01  Conveyance of Mortgage Loans. ....................................................... 16
Section 6.02  Books and Records. ............................................................................ 16
Section 6.03  Delivery of Mortgage Loan Documents. ........................................... 17

Section 6.04      Quality Control Procedures..................................................................... 18
Section 6.05      MERS Designated Loans. ................................................................... 18


ARTICLE VII

SERVICING OF THE MORTGAGE LOANS

Section 7.01      Servicing. ...................................................................................... 18


ARTICLE VIII

[RESERVED]


ARTICLE IX

REPRESENTATIONS, WARRANTIES AND COVENANTS
OF THE SELLER; REMEDIES FOR BREACH

Section 9.01      Representations and Warranties Regarding the Seller and the Originator. ....... 19
Section 9.02      Representations and Warranties Regarding Individual Mortgage Loans. ......... 23
Section 9.03      Remedies for Breach of Representations and Warranties. ............................... 38
Section 9.04      Repurchase of Mortgage Loans with First Payment Defaults .......................... 40
Section 9.05      Premium Recapture ....................................................................... 40


ARTICLE X

CLOSING

Section 10.01     Conditions to Closing. ..................................................................... 40


ARTICLE XI

CLOSING DOCUMENTS

Section 11.01     Required Closing Documents. ........................................................... 41


ARTICLE XII

COSTS

Section 12.01     Costs. ....................................................................................... 43

## ARTICLE XIII

### COOPERATION OF SELLER WITH A RECONSTITUTION

Section 13.01    Reconstitution of Mortgage Loans. ................................................................ 43

## ARTICLE XIV

### THE SELLER

Section 14.01    Additional Indemnification by the Seller; Third Party Claims. ........................ 45
Section 14.02    Merger or Consolidation of the Seller. ............................................................ 46

## ARTICLE XV

### MISCELLANEOUS PROVISIONS

Section 15.01    Financial Statements. ....................................................................................... 47
Section 15.02    Mandatory Delivery; Grant of Security Interest. ............................................. 47
Section 15.03    Notices. ............................................................................................................ 47
Section 15.04    Severability Clause. ......................................................................................... 48
Section 15.05    Counterparts. .................................................................................................... 48
Section 15.06    Governing Law. ............................................................................................... 49
Section 15.07    Intention of the Parties. ................................................................................... 49
Section 15.08    Successors and Assigns; Assignment of Purchase Agreement. ....................... 49
Section 15.09    Waivers. ........................................................................................................... 49
Section 15.10    Exhibits. ........................................................................................................... 50
Section 15.11    General Interpretive Principles. ....................................................................... 50
Section 15.12    Reproduction of Documents. ........................................................................... 50
Section 15.13    Further Agreements. ........................................................................................ 50
Section 15.14    Recordation of Assignments of Mortgage. ...................................................... 51
Section 15.15    No Solicitation. ................................................................................................ 51
Section 15.16    Waiver of Trial by Jury. ................................................................................... 51
Section 15.17    Governing Law Jurisdiction; Consent to Service of Process. ........................... 51

## ARTICLE XVI

### COMPLIANCE WITH REGULATION AB

Section 16.01    Intent of the Parties; Reasonableness. .............................................................. 52
Section 16.02    Additional Representations and Warranties of the Seller. ................................. 53
Section 16.03    Information to Be Provided by the Seller. ........................................................ 53
Section 16.04    Indemnification; Remedies. ............................................................................. 56

EXHIBITS

EXHIBIT A   CONTENTS OF EACH MORTGAGE FILE
EXHIBIT B   INDEMNIFICATION AND CONTRIBUTION AGREEMENT
EXHIBIT C   FORM OF SELLER'S OFFICER'S CERTIFICATE
EXHIBIT D   FORM OF OPINION OF COUNSEL TO THE SELLER AND ORIGINATOR
EXHIBIT E   FORM OF SECURITY RELEASE CERTIFICATION
EXHIBIT F   FORM OF SECURITY RELEASE CERTIFICATION
EXHIBIT G   UNDERWRITING GUIDELINES
EXHIBIT H   FORM OF ASSIGNMENT AND CONVEYANCE AGREEMENT
EXHIBIT I   FORM OF ASSIGNMENT AND RECOGNITION AGREEMENT

## AMENDED AND RESTATED MORTGAGE LOAN PURCHASE AGREEMENT

This AMENDED AND RESTATED MORTGAGE LOAN PURCHASE AGREEMENT (the "Agreement"), dated as of June 1, 2006, by and between Sutton Funding LLC, a Delaware limited liability company, c/o Global Securitization Services, LLC having an office at 445 Broad Hollow Road, Suite 239, Melville, New York 11747 (the "Purchaser"), and NC Capital Corporation, a California corporation, having an office at 18400 Von Karman, Suite 1000, Irvine, CA 92612 (the "Seller").

## W I T N E S S E T H:

WHEREAS, the Purchaser and the Seller are parties to that certain Mortgage Loan Purchase Agreement, dated as of January 1, 2006 (the "Original Purchase Agreement"), pursuant to which the Seller may sell, from time to time, to the Purchaser, and the Purchaser may purchase, from time to time, from the Seller, certain first and second lien, adjustable-rate and fixed-rate residential mortgage loans (the "Mortgage Loans") on a servicing released basis as described therein, and which shall be delivered in pools of whole loans (each, a "Mortgage Loan Package") on various dates as provided therein (each, a "Closing Date");

WHEREAS, at the present time, the Purchaser and the Seller desire to amend and restate the Original Purchase Agreement to make certain modifications as set forth herein, and upon the execution and delivery of this Agreement by the Purchaser and the Seller this Agreement shall supercede the Original Purchase Agreement and supplant the Original Purchase Agreement with respect to all Mortgage Loans subject to this Agreement or the Original Purchase Agreement;

NOW, THEREFORE, in consideration of the premises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchaser and the Seller agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01   Defined Terms.

For purposes of this Agreement the following capitalized terms shall have the respective meanings set forth below.

Accepted Servicing Practices:   With respect to any Mortgage Loan, those mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located and incorporating the Delinquency Collection Policies and Procedures.

Act:  The National Housing Act, as amended from time to time.

Adjustable Rate Mortgage Loan:  An adjustable rate Mortgage Loan purchased pursuant to this Agreement.

Affiliate:  With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Agency Transfer:  A Fannie Mae Transfer or a Freddie Mac Transfer.

Agreement:  This Amended and Restated Mortgage Loan Purchase Agreement and all amendments hereof and supplements hereto.

ALTA:  The American Land Title Association or any successor thereto.

Ancillary Income:  All late charges, assumption fees, escrow account benefits, reinstatement fees, and similar types of fees arising from or in connection with any Mortgage, to the extent not otherwise payable to the Mortgagor under applicable law or pursuant to the terms of the related Mortgage Note.

Appraised Value:  The value set forth in an appraisal made in connection with the origination of the related Mortgage Loan as the value of the Mortgaged Property.

Assignment and Conveyance Agreement:  As defined in Section 6.01.

Assignment of Mortgage:  An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the sale of the Mortgage to the Purchaser.

Balloon Mortgage Loan:  Any Mortgage Loan which by its original terms or any modifications thereof provides for amortization beyond its scheduled maturity date.

BIF:  The Bank Insurance Fund, or any successor thereto.

Business Day:  Any day other than (i) a Saturday or Sunday, (ii) a day on which banking and savings and loan institutions, in the State of New York or the State in which the Originator's servicing operations are located or (iii) the state in which the Custodian's operations are located, are authorized or obligated by law or executive order to be closed.

Closing Date:  The date or dates on which the Purchaser from time to time shall purchase, and the Seller from time to time shall sell, the Mortgage Loans listed on the related Mortgage Loan Schedule with respect to the related Mortgage Loan Package.

CLTV:  As of any date and as to any Second Lien Loan, the ratio, expressed as a percentage, of the (a) sum of (i) the outstanding principal balance of the Second Lien Loan and (ii) the outstanding principal balance as of such date of any mortgage loan or mortgage loans that