provisions of Regulation AB, together with such disclosures relating to the Seller, any Third-Party Originator and the Mortgage Loans, or the servicing of the Mortgage Loans, reasonably believed by the Purchaser or any Depositor to be necessary in order to effect such compliance.

The Purchaser (including any of its assignees or designees) shall cooperate with the Seller by providing timely notice of requests for information under these provisions and by reasonably limiting such requests to information required, in the Purchaser's reasonable judgment, to comply with Regulation AB.

Section 16.02   <u>Additional Representations and Warranties of the Seller.</u>

(a)   The Seller shall be deemed to represent to the Purchaser and to any Depositor, as of the date on which information is first provided to the Purchaser or any Depositor under Subsection 16.03 that, except as disclosed in writing to the Purchaser or such Depositor prior to such date:  (i) the Seller is not aware and has not received notice that any default, early amortization or other performance triggering event has occurred as to any other securitization due to any act or failure to act of the Seller; (ii) the Interim Servicer has not been terminated as servicer in a residential mortgage loan securitization, either due to a servicing default or to application of a servicing performance test or trigger; (iii) no material noncompliance with the applicable servicing criteria with respect to other securitizations of residential mortgage loans involving the Interim Servicer as servicer has been disclosed or reported by the Seller; (iv) no material changes to the Interim Servicer's policies or procedures with respect to the servicing function it will perform under the Interim Servicing Agreement and any Reconstitution Agreement for mortgage loans of a type similar to the Mortgage Loans have occurred during the three-year period immediately preceding the related Securitization Transaction; (v) there are no aspects of the Interim Servicer's financial condition that could have a material adverse effect on the performance by the Interim Servicer of its servicing obligations under the Interim Servicing Agreement or any Reconstitution Agreement; (vi) there are no material legal or governmental proceedings pending (or known to be contemplated) against the Seller, Interim Servicer, any Subservicer or any Third-Party Originator; and (vii) there are no affiliations, relationships or transactions relating to the Seller, Interim Servicer, any Subservicer or any Third-Party Originator with respect to any Securitization Transaction and any party thereto identified by the related Depositor of a type described in Item 1119 of Regulation AB.

(b)   If so requested by the Purchaser or any Depositor on any date following the date on which information is first provided to the Purchaser or any Depositor under Subsection 16.03, the Seller shall, within five Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in paragraph (a) of this Section or, if any such representation and warranty is not accurate as of the date of such request, provide reasonably adequate disclosure of the pertinent facts, in writing, to the requesting party.

Section 16.03   <u>Information to Be Provided by the Seller.</u>

In connection with any Securitization Transaction the Seller shall (i) within five Business Days following request by the Purchaser or any Depositor, provide to the Purchaser and such Depositor (or, as applicable, cause each Third-Party Originator to provide), in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, the

information and materials specified in paragraphs (a) and (b) of this Section, and (ii) as promptly as practicable following notice to or discovery by the Seller, provide to the Purchaser and any Depositor (in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor) the information specified in paragraph (d) of this Section. Notwithstanding the foregoing, the information required pursuant to Items 1110(b) and 1117 of Regulation AB (as further detailed below) shall only be required to the extent that mortgage loans originated by the Seller or a Third Party Originator, as the case may be, in the related Securitization Transaction comprise 20% or more (or such other percentage as may be required from time to time under Regulation AB) of the aggregate pool of mortgage loans in such Securitization Transaction.

(a)     If so requested by the Purchaser or any Depositor, the Seller shall provide such information regarding (i) the Seller, as originator of the Mortgage Loans (including as an acquirer of Mortgage Loans from a Qualified Correspondent), or (ii) each Third-Party Originator, as is requested for the purpose of compliance with Items 1103(a)(1), 1105, 1110, 1117 and 1119 of Regulation AB. Such information shall include, at a minimum:

(A)     the originator's form of organization;

(B)     a description of the originator's origination program and how long the originator has been engaged in originating residential mortgage loans, which description shall include a discussion of the originator's experience in originating mortgage loans of a similar type as the Mortgage Loans; information regarding the size and composition of the originator's origination portfolio; and information that may be material, in the good faith judgment of the Purchaser or any Depositor, to an analysis of the performance of the Mortgage Loans, including the originators' credit-granting or underwriting criteria for mortgage loans of similar type(s) as the Mortgage Loans and such other information as the Purchaser or any Depositor may reasonably request for the purpose of compliance with Item 1110(b)(2) of Regulation AB;

(C)     a description of any material legal or governmental proceedings pending (or known to be contemplated) against the Seller and each Third-Party Originator; and

(D)     a description of any affiliation or relationship between the Seller, each Third-Party Originator and any of the following parties to a Securitization Transaction, as such parties are identified to the Seller by the Purchaser or any Depositor in writing in advance of such Securitization Transaction:

(1)     the sponsor;
(2)     the depositor;
(3)     the issuing entity;
(4)     any servicer;
(5)     any trustee;
(6)     any originator;
(7)     any significant obligor;
(8)     any enhancement or support provider; and
(9)     any other material transaction party.

(b)     If so requested by the Purchaser or any Depositor, the Seller shall provide (or, as applicable, cause each Third-Party Originator to provide) Static Pool Information with respect to the mortgage loans (of a similar type as the Mortgage Loans, as reasonably identified by the Purchaser as provided below) originated by (i) the Seller, if the Seller is an originator of Mortgage Loans (including as an acquirer of Mortgage Loans from a Qualified Correspondent), and/or (ii) each Third-Party Originator.  Such Static Pool Information shall be prepared by the Seller (or Third-Party Originator) on the basis of its reasonable, good faith interpretation of the requirements of Item 1105(a)(1)-(3) of Regulation AB.  To the extent that there is reasonably available to the Seller (or Third-Party Originator) Static Pool Information with respect to more than one mortgage loan type, the Purchaser or any Depositor shall be entitled to specify whether some or all of such information shall be provided pursuant to this paragraph.  The content of such Static Pool Information may be in the form customarily provided by the Seller, and need not be customized for the Purchaser or any Depositor.  Such Static Pool Information for each vintage origination year or prior securitized pool, as applicable, shall be presented in increments no less frequently than quarterly over the life of the mortgage loans included in the vintage origination year or prior securitized pool.  The most recent periodic increment must be as of a date no later than 135 days prior to the date of the prospectus or other offering document in which the Static Pool Information is to be included or incorporated by reference.  The Static Pool Information shall be provided in an electronic format that provides a permanent record of the information provided, such as a portable document format (pdf) file, or other such electronic format reasonably required by the Purchaser or the Depositor, as applicable.

Promptly following notice or discovery of a material error in Static Pool Information provided pursuant to the immediately preceding paragraph (including an omission to include therein information required to be provided pursuant to such paragraph), the Seller shall provide corrected Static Pool Information to the Purchaser or any Depositor, as applicable, in the same format in which Static Pool Information was previously provided to such party by the Seller.

If so requested by the Purchaser or any Depositor, the Seller shall provide (or, as applicable, cause each Third-Party Originator to provide), at the expense of the requesting party (to the extent of any additional incremental expense associated with delivery pursuant to this Agreement), such agreed-upon procedures letters of certified public accountants reasonably acceptable to the Purchaser or Depositor, as applicable, pertaining to Static Pool Information relating to prior securitized pools for securitizations closed on or after January 1, 2006 or, in the case of Static Pool Information with respect to the Seller's or Third-Party Originator's originations or purchases, to calendar months commencing January 1, 2006, as the Purchaser or such Depositor shall reasonably request.  Such letters shall be addressed to and be for the benefit of such parties as the Purchaser or such Depositor shall designate, which may include, by way of example, any Sponsor, any Depositor and any broker dealer acting as underwriter, placement agent or initial purchaser with respect to a Securitization Transaction.  Any such statement or letter may take the form of a standard, generally applicable document accompanied by a reliance letter authorizing reliance by the addressees designated by the Purchaser or such Depositor.

(c)     [Reserved].

(d)      If so requested by the Purchaser or any Depositor for the purpose of satisfying its reporting obligation under the Exchange Act with respect to any class of asset-backed securities, the Seller shall (or shall cause each Third-Party Originator to) (i) notify the Purchaser and any Depositor in writing of (A) any material litigation or governmental proceedings pending against the Seller or any Third-Party Originator and (B) any affiliations or relationships that develop following the closing date of a Securitization Transaction between the Seller or any Third-Party Originator and any of the parties specified in clause (D) of paragraph (a) of this Section (and any other parties identified in writing by the requesting party) with respect to such Securitization Transaction, and (ii) provide to the Purchaser and any Depositor a description of such proceedings, affiliations or relationships.

Section 16.04  <u>Indemnification; Remedies</u>.

(a)      The Seller shall indemnify the Purchaser, each affiliate of the Purchaser, and each of the following parties participating in a Securitization Transaction: each sponsor and issuing entity; each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction; each broker dealer acting as underwriter, placement agent or initial purchaser, each Person who controls any of such parties or the Depositor (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act); and the respective present and former directors, officers, employees and agents of each of the foregoing and of the Depositor, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon:

(i)(A) any untrue statement of a material fact contained or alleged to be contained in any information, report, certification, accountants' letter or other material provided in written or electronic form under this Section 16 by or on behalf of the Seller, or provided under this Section 16 by or on behalf of any Third-Party Originator (collectively, the "<u>Seller Information</u>"), or (B) the omission or alleged omission to state in the Seller Information a material fact required to be stated in the Seller Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, by way of clarification, that clause (B) of this paragraph shall be construed solely by reference to the Seller Information and not to any other information communicated in connection with a sale or purchase of securities, without regard to whether the Seller Information or any portion thereof is presented together with or separately from such other information;

(ii)      any failure by the Seller or any Third-Party Originator to deliver any information, report, certification, accountants' letter or other material when and as required under this Section 16; or

(iii)     any breach by the Seller of a representation or warranty set forth in Subsection 16.02(a) or in a writing furnished pursuant to Subsection 16.02(b) and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that such breach is not cured by such closing date, or any breach by the Seller of a

representation or warranty in a writing furnished pursuant to Subsection 16.02(b) to the extent made as of a date subsequent to such closing date.

In the case of any failure of performance described in clause (a)(ii) of this Section, the Seller shall promptly reimburse the Purchaser, any Depositor, as applicable, and each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction, for all costs reasonably incurred by each such party in order to obtain the information, report, certification, accountants' letter or other material not delivered as required by the Seller or any Third-Party Originator.

(b)    Any failure by the Seller or any Third-Party Originator to deliver any information, report, certification, accountants' letter or other material when and as required under this Section 16, or any breach by the Seller of a representation or warranty set forth in Subsection 16.02(a) or in a writing furnished pursuant to Subsection 16.02(b) and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that such breach is not cured by such closing date, or any breach by the Seller of a representation or warranty in a writing furnished pursuant to Subsection 16.02(b) to the extent made as of a date subsequent to such closing date, shall immediately and automatically, without notice or grace period, constitute an Event of Default with respect to the Seller under this Agreement and any applicable Reconstitution Agreement, and shall entitle the Purchaser or Depositor, as applicable, in its sole discretion to terminate the rights and obligations of the Interim Servicer as servicer under the Interim Servicing Agreement and/or any applicable Reconstitution Agreement without payment (notwithstanding anything in this Agreement or any applicable Reconstitution Agreement to the contrary) of any compensation to the Interim Servicer; provided that to the extent that any provision of this Agreement and/or any applicable Reconstitution Agreement expressly provides for the survival of certain rights or obligations following termination of the Interim Servicer as servicer, such provision shall be given effect.

[Signature Page Follows]

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

SUTTON FUNDING LLC
(Purchaser)

By: _____

   Name: **Paul Menefee**

   Title: **Director**

NC CAPITAL CORPORATION
(Seller)

By: _____

   Name:

   Title:

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

SUTTON FUNDING LLC
(Purchaser)

By:_____
    Name:
    Title:

NC CAPITAL CORPORATION
(Seller)

By:_____
    Name:
    Title:        Kevin Cloyd
                  President

**EXHIBIT A**

**CONTENTS OF EACH MORTGAGE FILE**

With respect to each Mortgage Loan, the Mortgage File shall include each of the following items, which shall be available for inspection by the Purchaser and any prospective Purchaser, and which shall be delivered to the Custodian, or to such other Person as the Purchaser shall designate in writing, pursuant to Article VI of the Amended and Restated Mortgage Loan Purchase Agreement to which this Exhibit is attached (the "Agreement"):

(a)    the original Mortgage Note bearing all intervening endorsements, endorsed "Pay to the order of _____, without recourse" and signed in the name of the last endorsee (the "Last Endorsee") by an authorized officer. To the extent that there is no room on the face of the Mortgage Notes for endorsements, the endorsement may be contained on an allonge, if state law so allows and the Custodian is so advised by the Seller that state law so allows. If the Mortgage Loan was acquired by the Seller in a merger, the endorsement must be by "[Last Endorsee], successor by merger to [name of predecessor]". If the Mortgage Loan was acquired or originated by the Last Endorsee while doing business under another name, the endorsement must be by "[Last Endorsee], formerly known as [previous name]";

(b)    the original of any guarantee executed in connection with the Mortgage Note;

(c)    with respect to Mortgage Loans that are not Co-op Loans, the original Mortgage with evidence of recording thereon. With respect to any Co-op Loan, an original or copy of the Security Agreement. If in connection with any Mortgage Loan, the Seller cannot deliver or cause to be delivered the original Mortgage with evidence of recording thereon on or prior to the Closing Date because of a delay caused by the public recording office where such Mortgage has been delivered for recordation or because such Mortgage has been lost or because such public recording office retains the original recorded Mortgage, the Seller shall deliver or cause to be delivered to the Custodian, a photocopy of such Mortgage, together with (i) in the case of a delay caused by the public recording office, an Officer's Certificate of the Seller (or certified by the title company, escrow agent, or closing attorney) stating that such Mortgage has been dispatched to the appropriate public recording office for recordation and that the original recorded Mortgage or a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage will be promptly delivered to the Custodian upon receipt thereof by the Seller; or (ii) in the case of a Mortgage where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage;

(d)    the originals of all assumption, modification, consolidation or extension agreements, if any, with evidence of recording thereon;

(e)     with respect to Mortgage Loans that are not Co-op Loans, the original Assignment of Mortgage for each Mortgage Loan, in form and substance acceptable for recording (except with respect to MERS Designated Loans).  The Assignment of Mortgage must be duly recorded only if recordation is either necessary under applicable law or commonly required by private institutional mortgage investors in the area where the Mortgaged Property is located or on direction of the Purchaser as provided in this Agreement.  If the Assignment of Mortgage is to be recorded, the Mortgage shall be assigned to the Purchaser.  If the Assignment of Mortgage is not to be recorded, the Assignment of Mortgage shall be delivered in blank.  If the Mortgage Loan was acquired by the Seller in a merger, the Assignment of Mortgage must be made by "[Seller], successor by merger to [name of predecessor]".  If the Mortgage Loan was acquired or originated by the Seller while doing business under another name, the Assignment of Mortgage must be by "[Seller], formerly known as [previous name]";

(f)     with respect to Mortgage Loans that are not Co-op Loans, the originals of all intervening assignments of mortgage (if any) evidencing a complete chain of assignment from the Originator to the Last Endorsee (or, in the case of a MERS Designated Loan, MERS) with evidence of recording thereon, or if any such intervening assignment has not been returned from the applicable recording office or has been lost or if such public recording office retains the original recorded assignments of mortgage, the Seller shall deliver or cause to be delivered to the Custodian, a photocopy of such intervening assignment, together with (i) in the case of a delay caused by the public recording office, an Officer's Certificate of the Seller (or certified by the title company, escrow agent, or closing attorney) stating that such intervening assignment of mortgage has been dispatched to the appropriate public recording office for recordation and that such original recorded intervening assignment of mortgage or a copy of such intervening assignment of mortgage certified by the appropriate public recording office to be a true and complete copy of the original recorded intervening assignment of mortgage will be promptly delivered to the Custodian upon receipt thereof by the Seller; or (ii) in the case of an intervening assignment where a public recording office retains the original recorded intervening assignment or in the case where an intervening assignment is lost after recordation in a public recording office, a copy of such intervening assignment certified by such public recording office to be a true and complete copy of the original recorded intervening assignment;

(g)     with respect to Mortgage Loans that are not Co-op Loans, the original mortgagee policy of title insurance or, in the event such original title policy is unavailable, a certified true copy of the related policy binder or commitment for title certified to be true and complete by the title insurance company;

(h)     the original or, if unavailable, a copy of any security agreement, chattel mortgage or equivalent document executed in connection with the Mortgage;

(i)     with respect to any Co-op Loan: (i) a copy of the Co-op Lease and the assignment of such Co-op Lease, with all intervening assignments showing a complete chain of title and an assignment thereof by Seller; (ii) the stock certificate together with an undated stock power relating to such stock certificate executed in blank; (iii) the recognition agreement of the

A-2

interests of the mortgagee with respect to the Co-op Loan by the residential cooperative housing corporation, the stock of which was pledged by the related Mortgagor to the originator of such Co-op Loan; and (iv) copies of the financial statement filed by the originator as secured party and, if applicable, a filed UCC-3 assignment of the subject security interest showing a complete chain of title, together with an executed UCC-3 assignment of such security interest by the Seller in a form sufficient for filing; and

        (j)    if any of the above documents has been executed by a person holding a power of attorney, an original or photocopy of such power certified by the Seller to be a true and correct copy of the original.

        In the event an Officer's Certificate of the Seller is delivered to the Purchaser because of a delay caused by the public recording office in returning any recorded document, the Seller shall deliver to the Purchaser, within 90 days of the related Closing Date, an Officer's Certificate which shall (i) identify the recorded document, (ii) state that the recorded document has not been delivered to the Custodian due solely to a delay caused by the public recording office, (iii) state the amount of time generally required by the applicable recording office to record and return a document submitted for recordation, and (iv) specify the date the applicable recorded document will be delivered to the Custodian; *provided, however*, that any recorded document shall in no event be delivered later than one year following the related Closing Date. An extension of the date specified in clause (iv) above may be requested from the Purchaser, which consent shall not be unreasonably withheld.

**EXHIBIT B**

**FORM OF INDEMNIFICATION AND CONTRIBUTION AGREEMENT**

THIS INDEMNIFICATION AND CONTRIBUTION AGREEMENT dated _____, 200_ ("Agreement") among [_____], a [_____] (the "Depositor"), [_____], a [_____] (the "Underwriter"), and [_____], a [_____] (the "Indemnifying Party").

W I T N E S S E T H:

WHEREAS, the Indemnifying Party and the Depositor are parties to the Pooling and Servicing Agreement (as defined herein);

WHEREAS, the Indemnifying Party originated or acquired the Mortgage Loans and subsequently sold the Mortgage Loans to Sutton Funding LLC (the "Purchaser"), an affiliate of the Depositor, in anticipation of the securitization transaction;

WHEREAS, the Indemnifying Party also stands to receive substantial financial benefits in its capacity as servicer under the Pooling and Servicing Agreement;

WHEREAS, as an inducement to the Depositor to enter into the Pooling and Servicing Agreement and the Underwriter to enter into the Underwriting Agreement (as defined herein), the Indemnifying Party wishes to provide for indemnification and contribution on the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

1.1     Certain Defined Terms.  The following terms shall have the meanings set forth below, unless the context clearly indicates otherwise:

1933 Act:  The Securities Act of 1933, as amended.

1934 Act:  The Securities Exchange Act of 1934, as amended.

Agreement:  This Indemnification and Contribution Agreement, as the same may be amended in accordance with the terms hereof.

Free Writing Prospectus:  Any written communication that constitutes a "free writing prospectus," as defined in Rule 405 under the 1933 Act.

<u>Indemnified Parties</u>:  As defined in Section 3.1.

<u>Indemnifying Party Information</u>:    (A) All information in the Prospectus Supplement, the Offering Circular, any Free Writing Prospectus or any amendment or supplement thereto (i) contained under the headings "Summary—Relevant Parties—Responsible Party [and Servicer,"] "The Mortgage Loan Pool—Underwriting Guidelines" [and "The Servicer"] and (ii) regarding the Mortgage Loans, the related mortgagors and/or the related Mortgaged Properties (but in the case of this clause (ii), only to the extent any untrue statement or omission arose from or is based upon errors or omissions in the information concerning the Mortgage Loans, the related mortgagors and/or the related Mortgaged Properties, as applicable, provided to the Depositor or any affiliate by or on behalf of the Indemnifying Party)[, and (B) any static pool information regarding mortgage loans originated or acquired by the Seller [and included in the Prospectus Supplement, the Offering Circular, any Free Writing Prospectus or the Comp Materials or any amendment or supplement thereto] [incorporated by reference from the Seller's website located at _____ ]].

<u>Offering Circular</u>:  The offering circular, dated [            ], 200_, relating to the private offering of the Privately Offered Certificates, including any structural term sheets, collateral terms sheets and computational materials used in connection with such offering.

<u>Person</u>:  Any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

<u>Pooling and Servicing Agreement</u>:  The Pooling and Servicing Agreement, dated as of _____, 200_, among the Depositor, the Indemnifying Party, as responsible party and servicer, and [_____ ].

<u>Privately Offered Certificates</u>:  SABR Trust [_____], Mortgage Pass-Through Certificates, Series [_____], Class [__] issued pursuant to the Pooling and Servicing Agreement.

<u>Prospectus Supplement</u>:    The preliminary prospectus supplement, dated _____, 200_, together with the final prospectus supplement, dated _____, 200_, relating to the offering of the Publicly Offered Certificates.

<u>Publicly Offered Certificates</u>:  SABR Trust [_____], Mortgage Pass-Through Certificates, Series [_____], Class [__], Class [__], Class [__], Class [__], Class [__], Class [__] and Class [__] issued pursuant to the Pooling and Servicing Agreement.

<u>Underwriting Agreement</u>:  The Underwriting Agreement, dated _____, 200_, among the Depositor and the Underwriter, relating to the sale of the Publicly Offered Certificates.

1.2    <u>Other Terms</u>.  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Pooling and Servicing Agreement.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

Each party hereto represents that:

(a)     it has all requisite power and authority to execute, deliver and perform its obligations under this Agreement;

(b)     this Agreement has been duly authorized, executed and delivered by such party; and

(c)     assuming the due authorization, execution and delivery by each other party hereto, this Agreement constitutes the legal, valid and binding obligation of such party.

## ARTICLE III

## INDEMNIFICATION

3.1     <u>Indemnification by the Indemnifying Party of the Depositor and the Underwriter</u>. (a) The Indemnifying Party shall indemnify and hold harmless the Depositor and the Underwriter and their respective affiliates, and their respective present and former directors, officers, employees, agents and each Person, if any, that controls the Depositor, the Underwriter or such affiliate, within the meaning of either the 1933 Act or the 1934 Act (collectively, the "<u>Indemnified Parties</u>"), against any and all losses, claims, damages, penalties, fines, forfeitures or liabilities, joint or several, to which each such Indemnified Party may become subject, under the 1933 Act, the 1934 Act or otherwise, to the extent that such losses, claims, damages, penalties, fines, forfeitures or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Prospectus Supplement, the Offering Circular, any Free Writing Prospectus or any amendment or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, to the extent that such untrue statement or alleged untrue statement or omission or alleged omission relates to information set forth in the Indemnifying Party Information, and the Indemnifying Party shall in each case reimburse each Indemnified Party for any legal or other costs, fees, or expenses reasonably incurred and as incurred by such Indemnified Party in connection with investigating or defending any such loss, claim, damage, penalty, fine, forfeiture, liability or action.  The Indemnifying Party's liability under this Section 3.1 shall be in addition to any other liability that the Indemnifying Party may otherwise have.

(b)     If the indemnification provided for in this Section 3.1 shall for any reason be unavailable to an Indemnified Party under this Section 3.1 (other than due to indemnification not being applicable under Section 3.1(a)), then the party which would otherwise be obligated to indemnify with respect thereto, on the one hand, and the parties which would otherwise be entitled to be indemnified, on the other hand, shall contribute to the aggregate losses, liabilities, claims, damages, penalty, fine, forfeiture, costs, fees and expenses of the nature contemplated

herein and incurred by the parties hereto in such proportions that are appropriate to reflect the relative fault of the Depositor or the Underwriter, on the one hand, and the Indemnifying Party, on the other hand, in connection with the applicable misstatements or omissions as well as any other relevant equitable considerations.   Notwithstanding the foregoing, no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the 1933 Act) shall be entitled to contribution from any Person that was not guilty of such fraudulent misrepresentation. For purposes of this Section 3.1, each director of a party to this Agreement and each Person, if any, that controls a party to this Agreement within the meaning of Section 15 of the 1933 Act shall have the same rights to contribution as such party.

         3.2    <u>Notification; Procedural Matters</u>.   Promptly after receipt by an Indemnified Party under Section 3.1 of notice of any claim or the commencement of any action, such Indemnified Party shall, if a claim in respect thereof is to be made against the Indemnifying Party (or if a claim for contribution is to be made against another party) under Section 3.1, notify the Indemnifying Party (or other contributing party) in writing of the claim or the commencement of such action; provided, however, that the failure to notify the Indemnifying Party (or other contributing party) shall not relieve it from any liability which it may have under Section 3.1 except to the extent it has been materially prejudiced by such failure; and provided, further, however, that the failure to notify the Indemnifying Party shall not relieve it from any liability which it may have to any Indemnified Party (or to the party requesting contribution) otherwise than under Section 3.1.   In case any such action is brought against any Indemnified Party and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party shall be entitled to participate therein and, to the extent that, by written notice delivered to the Indemnified Party promptly after receiving the aforesaid notice from such Indemnified Party, the Indemnifying Party elects to assume the defense thereof, it may participate with counsel reasonably satisfactory to such Indemnified Party; provided, however, that if the defendants in any such action include both the Indemnified Party and the Indemnifying Party and the Indemnified Party or parties shall reasonably have concluded that there may be legal defenses available to it or them and/or other Indemnified Parties that are different from or additional to those available to the Indemnifying Party, or if the use of counsel chosen by the Indemnifying Party to represent the Indemnified Parties would present such counsel with a conflict of interest, the Indemnified Party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such Indemnified Party or parties.  Upon receipt of notice from the Indemnifying Party to such Indemnified Party of its election so to assume the defense of such action and approval by the Indemnified Party of such counsel, the Indemnifying Party shall not be liable to such Indemnified Party under this paragraph for any legal or other expenses subsequently incurred by such Indemnified Party in connection with the defense thereof, unless (i) the Indemnified Party shall have employed separate counsel (plus any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence, (ii) the Indemnifying Party shall not have employed counsel reasonably satisfactory to the Indemnified Party to represent the Indemnified Party within a reasonable time after notice of commencement of the action or (iii) the Indemnifying Party shall have authorized the employment of counsel for the Indemnified Party at the expense of the Indemnifying Party.  No party shall be liable for contribution with respect to any action or claim settled without its consent, which consent shall not be unreasonably withheld.  In no event shall the Indemnifying Party be liable for the fees and expenses of more than one counsel (in addition to any local counsel) separate from its own

counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances.

## ARTICLE IV

## GENERAL

4.1     Survival.  This Agreement and the obligations of the parties hereunder shall survive the purchase and sale of the Publicly Offered Certificates and Privately Offered Certificates.

4.2     Successors.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, each Indemnified Party and their respective successors and assigns, and no other Person shall have any right or obligation hereunder.

4.3     Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to principles of conflict of laws.

4.4     Miscellaneous.   Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated except by a writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.  This Agreement may be signed in any number of counterparts, each of which shall be deemed an original, which taken together shall constitute one and the same instrument.

4.5     Notices.  All communications hereunder shall be in writing and shall be deemed to have been duly given when delivered to:

In the case of the Depositor:

[_____]
[_____]
[_____]
Attention:  [_____]
Telephone:  [_____]

with a copy to:

Sutton Funding LLC
c/o Global Securitization Services, LLC
445 Broad Hollow Road, Suite 239
Melville, New York 11747
Attention:  Vice President
Telephone:  (631) 587-4700

with a copy to:

> c/o Barclays Bank PLC, as administrator
> 200 Park Avenue, 5th Floor
> New York, New York 10166
> Attention:  Mary Logan
> Telephone:  (212) 412-6846

In the case of the Underwriter:

> [_____]
> [_____]
> [_____]
> Attention:
> Telephone:

In the case of the Indemnifying Party:

> [_____]
> [_____]
> [_____]
> Attention:

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officers as of the date first above written.

[DEPOSITOR]

By: _____

    Name:

    Title:

[UNDERWRITER]

By: _____

    Name:

    Title:

[INDEMNIFYING PARTY]

By: _____

    Name:

    Title:

## EXHIBIT C

## <u>SELLER'S OFFICER'S CERTIFICATE</u>

I, _____, hereby certify that I am the duly elected [Vice] President of _____[COMPANY], a [state] [federally] chartered institution organized under the laws of the [state of _____] [United States] (the "<u>Company</u>") and further as follows:

1       Attached hereto as <u>Exhibit 1</u> is a true, correct and complete copy of the charter of the Company which is in full force and effect on the date hereof and which has been in effect without amendment, waiver, rescission or modification since _____.

2.      Attached hereto as <u>Exhibit 2</u> is a true, correct and complete copy of the bylaws of the Company which are in effect on the date hereof and which have been in effect without amendment, waiver, rescission or modification since _____.

3.      Attached hereto as <u>Exhibit 3</u> is an original certificate of good standing of the Company issued within ten days of the date hereof, and no event has occurred since the date thereof which would impair such standing.

4.      Attached hereto as <u>Exhibit 4</u> is a true, correct and complete copy of the corporate resolutions of the Board of Directors of the Company authorizing the Company to execute and deliver (a) Amended and Restated Mortgage Loan Purchase Agreement, dated as of June 1, 2006 (the "<u>Purchase Agreement</u>"), by and between Sutton Funding LLC (the "<u>Purchaser</u>") and the Company and (b) the Custodial Agreement, dated as of January 1, 2006 (the "<u>Custodial Agreement</u>"), by and among the Purchaser, the Company, _____ (the "<u>Interim Servicer</u>") and [CUSTODIAN] (the "<u>Custodian</u>"), [and to endorse the Mortgage Notes and execute the Assignments of Mortgages by original [or facsimile] signature], and such resolutions are in effect on the date hereof and have been in effect without amendment, waiver, rescission or modification since _____.

5.      Either (i) no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Company of or compliance by the Company with the Purchase Agreement, [the sale of the mortgage loans] or the consummation of the transactions contemplated by the agreements; or (ii) any required consent, approval, authorization or order has been obtained by the Company.

6.      Neither the consummation of the transactions contemplated by, nor the fulfillment of the terms of the Purchase Agreement conflicts or will conflict with or results or will result in a breach of or constitutes or will constitute a default under the charter or by-laws of the Company or, to the best of my knowledge, the terms of any indenture or other agreement or instrument to which the Company is a party or by which it is bound or to which it is subject, or any statute or order, rule, regulations, writ,

injunction or decree of any court, governmental authority or regulatory body to which the Company is subject or by which it is bound.

7.      To the best of my knowledge, there is no action, suit, proceeding or investigation pending or threatened against the Company which, in my judgment, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of the Company or in any material impairment of the right or ability of the Company to carry on its business substantially as now conducted or in any material liability on the part of the Company or which would draw into question the validity of the Purchase Agreement, or the mortgage loans or of any action taken or to be taken in connection with the transactions contemplated hereby, or which would be likely to impair materially the ability of the Company to perform under the terms of the Purchase Agreement.

8.      Each person listed on Exhibit 5 attached hereto who, as an officer or representative of the Company, signed (a) the Purchase Agreement, and (b) any other document delivered or on the date hereof in connection with any purchase described in the agreements set forth above was, at the respective times of such signing and delivery, and is now, a duly elected or appointed, qualified and acting officer or representative of the Company, who holds the office set forth opposite his or her name on Exhibit 5, and the signatures of such persons appearing on such documents are their genuine signatures.

9.      The Company is duly authorized to engage in the transactions described and contemplated in the Purchase Agreement.

        IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of the Company.

Dated:_____        By:_____

                                   Name:_____

[Seal]                             Title:      [Vice] President

        I, _____, an   [Assistant]   Secretary   of _____[COMPANY], hereby certify that _____ is the duly elected, qualified and acting [Vice] President of the Company and that the signature appearing above is [her] [his] genuine signature.

        IN WITNESS WHEREOF, I have hereunto signed my name.

Dated:_____        By:_____

                                   Name:_____

                                   Title:      [Assistant] Secretary

EXHIBIT 5 to
Company's Officer's Certificate

| <u>NAME</u> | <u>TITLE</u> | <u>SIGNATURE</u> |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

**EXHIBIT D**

**FORM OF OPINION OF COUNSEL TO THE SELLER AND ORIGINATOR**

(date)

Sutton Funding LLC
c/o Global Securitization Services, LLC
445 Broad Hollow Road, Suite 239
Melville, New York 11747

Dear Sirs:

You have requested [our] [my] opinion, as [Assistant] General Counsel to _____ (the "Company"), with respect to certain matters in connection with the sale by the Company of the Mortgage Loans pursuant to that certain Amended and Restated Mortgage Loan Purchase Agreement by and between the Company and Sutton Funding LLC (the "Purchaser"), dated as of June 1, 2006 (the "Purchase Agreement") and that certain Interim Servicing Agreement, by and between the Purchaser and New Century Mortgage Corporation (the "Originator"), dated as of January 1, 2006 (the "Servicing Agreement") which sale is in the form of whole loans, delivered pursuant to a Custodial Agreement dated as of January 1, 2006 among the Purchaser, the Company, the Originator and _____[CUSTODIAN] (the "Custodial Agreement", and collectively with the Purchase Agreement and the Servicing Agreement, the "Agreements"). Capitalized terms not otherwise defined herein have the meanings set forth in the Purchase Agreement.

[We] [I] have examined the following documents:

1.      the Purchase Agreement;

2.      the Servicing Agreement;

3.      the Custodial Agreement;

4.      the form of Assignment of Mortgage;

5.      the form of endorsement of the Mortgage Notes; and

6.      such other documents, records and papers as we have deemed necessary and relevant as a basis for this opinion.

To the extent [we] [I] have deemed necessary and proper, [we] [I] have relied upon the representations and warranties of the Company and the Originator contained in the Purchase Agreement. [We] [I] have assumed the authenticity of all documents submitted to [us] [me] as originals, the genuineness of all signatures, the legal capacity of natural persons and the conformity to the originals of all documents.

Based upon the foregoing, it is [our] [my] opinion that:

1.    The Company and the Originator are [type of entity] duly organized, validly existing and in good standing under the laws of the [United States] and is qualified to transact business in, and is in good standing under, the laws of [the state of incorporation].

2.    Each of the Company and the Originator has the power to engage in the transactions contemplated by the Agreements and all requisite power, authority and legal right to execute and deliver the Agreements and to perform and observe the terms and conditions of the Agreements.

3.    The Agreements have been duly authorized, executed and delivered by the Company and the Originator, as applicable, and are legal, valid and binding agreements enforceable in accordance with their terms against the Company and the Originator, as applicable, subject to bankruptcy laws and other similar laws of general application affecting rights of creditors and subject to the application of the rules of equity, including those respecting the availability of specific performance, none of which will materially interfere with the realization of the benefits provided thereunder or with the Purchaser's ownership of the Mortgage Loans.

4.    Each of the Company and the Originator has been duly authorized to allow any of its officers to execute any and all documents by original signature in order to complete the transactions contemplated by the Agreements.

5.    The Company has been duly authorized to allow any of its officers to execute by original [or facsimile] signature the endorsements to the Mortgage Notes and the Assignments of Mortgages, and the original [or facsimile] signature of the officer at the Company executing the endorsements to the Mortgage Notes and the Assignments of Mortgages represents the legal and valid signature of said officer of the Company.

6.    Either (i) no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Company or the Originator of or compliance by the Company or the Originator with the Agreements and the sale of the Mortgage Loans by the Company or the consummation of the transactions contemplated by the Agreements or (ii) any required consent, approval, authorization or order has been obtained by the Company or the Originator.

7.    Neither the consummation of the transactions contemplated by, nor the fulfillment of the terms of, the Agreements conflict or will conflict with or results or will result in a breach of or constitute or will

D-2

constitute a default under the charter or by-laws of the Company or the Originator, as applicable, or, to the best of my knowledge, the material terms of any indenture or other agreement or instrument to which the Company or the Originator is a party or by which it is bound or to which it is subject, or violates any statute or order, rule, regulations, writ, injunction or decree of any court, governmental authority or regulatory body to which the Company or the Originator is subject or by which it is bound.

8.      There is no action, suit, proceeding or investigation pending or, to the best of [our] [my] knowledge, threatened against the Company or the Originator which, in [our] [my] judgment, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of the Company or the Originator or in any material impairment of the right or ability of the Company or the Originator to carry on its business substantially as now conducted or in any material liability on the part of the Company or the Originator or which would draw into question the validity of the Agreements or the Mortgage Loans or of any action taken or to be taken in connection with the transactions contemplated thereby, or which would be likely to impair materially the ability of the Company or the Originator to perform under the terms of the Agreements.

9.      The sale of each Mortgage Note and Mortgage as and in the manner contemplated by the Agreements is sufficient to fully transfer to the Purchaser all right, title and interest of the Company thereto as noteholder and mortgagee.

10.     The Assignments of Mortgage are in recordable form, except for the insertion of the name of the assignee, and upon the name of the assignee being inserted, are acceptable for recording under the laws of the state where each related Mortgaged Property is located.   The endorsement of the Mortgage Notes, the delivery to the Purchaser, or its designee, of the Assignments of Mortgage, and the delivery of the original endorsed Mortgage Notes to the Purchaser, or its designee, are sufficient to permit the Purchaser to avail itself of all protection available under applicable law against the claims of any present or future creditors of the Company, and are sufficient to prevent any other sale, transfer, assignment, pledge or hypothecation of the Mortgages and the Mortgage Notes by the Company from being enforceable.

Except as otherwise set forth in the Agreements, I assume no obligation to revise this opinion or alter its conclusions to update or support this letter to reflect any facts or circumstances that may hereafter develop.

This opinion is given to you for your sole benefit, and no other person or entity is entitled to rely hereon except that the purchaser or purchasers to which you initially and directly

resell the Mortgage Loans may rely on this opinion as if it were addressed to them as of the date of this opinion.

Very truly yours,

_____

[Name]
[Assistant] General Counsel

**EXHIBIT E**

## FORM OF SECURITY RELEASE CERTIFICATION

_____, 200__

[Federal Home Loan Bank of
_____ (the "Association")]
_____
_____
_____

Attention: _____
_____

Re:   Notice of Sale and Release of Collateral

Dear Sirs:

This letter serves as notice that _____ [COMPANY] a [type of entity], organized pursuant to the laws of [the State of incorporation] (the "Company") has committed to sell certain mortgage loans to Sutton Funding LLC under a Amended and Restated Mortgage Loan Purchase Agreement, dated as of June 1, 2006.  The Company warrants that the mortgage loans to be sold to Sutton Funding LLC are in addition to and beyond any collateral required to secure advances made by the Association to the Company.

The Company acknowledges that the mortgage loans to be sold to Sutton Funding LLC shall not be used as additional or substitute collateral for advances made by the Association. Sutton Funding LLC understands that the balance of the Company's mortgage loan portfolio may be used as collateral or additional collateral for advances made by the Association, and confirms that it has no interest therein.

Execution of this letter by the Association shall constitute a full and complete release of any security interest, claim, or lien which the Association may have against the mortgage loans to be sold to Sutton Funding LLC.

[Signature Page Follows]

Very truly yours,

_____

By:_____
Name:_____
Title:_____
Date:_____

Acknowledged and approved:

[FEDERAL HOME LOAN BANK OF]

_____

By:_____
Name:_____
Title:_____
Date:_____

## EXHIBIT F

## <u>FORM OF SECURITY RELEASE CERTIFICATION</u>

### I.  <u>Release of Security Interest</u>

   The financial institution named below hereby relinquishes any and all right, title, interest, lien or claim of any kind it may have in all mortgage loans described on the attached <u>Schedule A</u> (the "<u>Mortgage Loans</u>"), to be purchased by Sutton Funding LLC from the company named on the next page (the "<u>Company</u>") pursuant to that certain Amended and Restated Mortgage Loan Purchase Agreement, dated as of June 1, 2006, and certifies that all notes, mortgages, assignments and other documents in its possession relating to such Mortgage Loans have been delivered and released to the Company or its designees, as of the date and time of the sale of such Mortgage Loans to Sutton Funding LLC.   Such release shall be effective automatically without any further action by any party upon payment in one or more installments, in immediately available funds, of $_____ , in accordance with the wire instructions set forth below.

Name, Address and Wire Instructions of Financial Institution

_____
    (Name)

_____
    (Address)

_____

_____

_____


By:_____

## II. Certification of Release

The Company named below hereby certifies to Sutton Funding LLC that, as of the date and time of the sale of the above-mentioned Mortgage Loans to Sutton Funding LLC the security interests in the Mortgage Loans released by the above-named financial institution comprise all security interests relating to or affecting any and all such Mortgage Loans. The Company warrants that, as of such time, there are and will be no other security interests affecting any or all of such Mortgage Loans.

---------------------------------------------

By:_____

Title:_____

Date:_____

F-2

**EXHIBIT G**

**UNDERWRITING GUIDELINES**



**EXHIBIT H**

**FORM OF ASSIGNMENT AND CONVEYANCE AGREEMENT**

On this ___ day of _____, 200_, NC Capital Corporation ("Seller"), as the Seller under (i) that certain Purchase Price and Terms Agreement, dated as of _____, 200_ (the "PPTA"), and (ii) that certain Amended and Restated Mortgage Loan Purchase Agreement, dated as of June 1, 2006 (the "Purchase Agreement"), does hereby sell, transfer, assign, set over and convey to Sutton Funding LLC ("Purchaser") as the Purchaser under the Agreements (as defined below) without recourse, but subject to the terms of the Agreements, all right, title and interest of, in and to the Mortgage Loans listed on the Mortgage Loan Schedule attached hereto as Exhibit A (the "Mortgage Loans"), together with the Mortgage Files and the related Servicing Rights and all rights and obligations arising under the documents contained therein. Each Mortgage Loan subject to the Agreements was underwritten in accordance with, and conforms to, the Underwriting Guidelines attached hereto as Exhibit C. Pursuant to Article VI of the Purchase Agreement, the Seller has delivered to the Custodian the documents for each Mortgage Loan to be purchased as set forth in the Purchase Agreement The contents of each Servicing File required to be retained by _____ ("Interim Servicer"), as interim servicer under that certain Interim Servicing Agreement, dated as of January 1, 2006 (the "Servicing Agreement") to service the Mortgage Loans pursuant to the Servicing Agreement and thus not delivered to the Purchaser are and shall be held in trust by the Interim Servicer for the benefit of the Purchaser as the owner thereof. The Interim Servicer's possession of any portion of the Servicing File is at the will of the Purchaser for the sole purpose of facilitating servicing of the related Mortgage Loan pursuant to the Servicing Agreement, and such retention and possession by the Servicer shall be in a custodial capacity only. The ownership of each Mortgage Note, Mortgage, the Servicing Rights and the contents of the Mortgage File and Servicing File is vested in the Purchaser and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or which come into the possession of the Seller or the Interim Servicer shall immediately vest in the Purchaser and shall be retained and maintained, in trust, by the Seller at the will of the Purchaser in a custodial capacity only. The PPTA, the Purchase Agreement and the Servicing Agreement shall collectively be referred to as the "Agreements" herein.

The Mortgage Loan Package characteristics of the Mortgage Loans subject hereto are set forth on Exhibit B attached hereto.

In accordance with Article VI of the Purchase Agreement, the Purchaser accepts the Mortgage Loans listed on Exhibit A attached hereto. Notwithstanding the foregoing the Purchaser does not waive any rights or remedies it may have under the Agreements.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Purchase Agreement.

[SIGNATURE PAGE FOLLOWS]

[SELLER]

By: _____
    Name:       ·_____
    Title:      _____

[INTERIM SERVICER]

By: _____
    Name:      _____
    Title:      _____

Accepted and Agreed:

SUTTON FUNDING LLC

By: _____
    Name:
    Title:

EXHIBIT A
TO ASSIGNMENT AND CONVEYANCE AGREEMENT

THE MORTGAGE LOANS



H-3

EXHIBIT B
TO ASSIGNMENT AND CONVEYANCE AGREEMENT

[Pool Characteristics of the Mortgage Loan Package as delivered on the related Closing Date:]



EXHIBIT C
TO ASSIGNMENT AND CONVEYANCE AGREEMENT

UNDERWRITING GUIDELINES



**EXHIBIT I**

FORM OF ASSIGNMENT AND RECOGNITION AGREEMENT

THIS ASSIGNMENT AND RECOGNITION AGREEMENT, dated [_____ __, 20__] ("Agreement"), among Sutton Funding LLC ("Assignor"), [_____] ("Assignee") and NC Capital Corporation (the "Company"):

For and in consideration of the sum of TEN DOLLARS ($10.00) and other valuable consideration the receipt and sufficiency of which hereby are acknowledged, and of the mutual covenants herein contained, the parties hereto hereby agree as follows:

Assignment and Conveyance

1.      The Assignor hereby conveys, sells, grants, transfers and assigns to the Assignee all of the right, title and interest of the Assignor, as purchaser, in, to and under (a) those certain Mortgage Loans listed on the schedule (the "Mortgage Loan Schedule") attached hereto as Exhibit A (the "Mortgage Loans") and (b) except as described below, that certain Amended and Restated Mortgage Loan Purchase Agreement (the "Purchase Agreement"), dated as of [DATE], between the Assignor, as purchaser (the "Purchaser"), and the Company, as seller, solely insofar as the Purchase Agreement relates to the Mortgage Loans.

The Assignor specifically reserves and does not assign to the Assignee hereunder (i) any and all right, title and interest in, to and under and any obligations of the Assignor with respect to any mortgage loans subject to the Purchase Agreement which are not the Mortgage Loans set forth on the Mortgage Loan Schedule and are not the subject of this Agreement or (ii) the rights of the Purchaser under Section 9.04 of the Purchase Agreement.

Recognition of the Company

2.      From and after the date hereof (the "Securitization Closing Date"), the Company shall and does hereby recognize that the Assignee will transfer the Mortgage Loans and assign its rights under the Purchase Agreement (solely to the extent set forth herein) and this Agreement to [_____] (the "Trust") created pursuant to a Pooling and Servicing Agreement, dated as of [_____], 200[_] (the "Pooling Agreement"), among the Assignee, the Assignor, [_____], as trustee (including its successors in interest and any successor trustees under the Pooling Agreement, the "Trustee"), [_____], as servicer (including its successors in interest and any successor servicer under the Pooling Agreement, the "Servicer"). The Company hereby acknowledges and agrees that from and after the date hereof (i) the Trust will be the owner of the Mortgage Loans, (ii) the Company shall look solely to the Trust for performance of any obligations of the Assignor insofar as they relate to the Mortgage Loans, (iii) the Trust (including the Trustee and the Servicer acting on the Trust's behalf) shall have all the rights and remedies available to the Assignor, insofar as they relate to the Mortgage Loans, under the Purchase Agreement, including, without limitation, the enforcement of the document delivery requirements set forth in Section 6 of the Purchase Agreement, and shall be entitled to enforce all of the obligations of the Company thereunder insofar as they relate to the Mortgage Loans, and (iv) all references to the Purchaser, the

Custodian or the Bailee under the Purchase Agreement insofar as they relate to the Mortgage Loans, shall be deemed to refer to the Trust (including the Trustee and the Servicer acting on the Trust's behalf).  Neither the Company nor the Assignor shall amend or agree to amend, modify, waiver, or otherwise alter any of the terms or provisions of the Purchase Agreement which amendment, modification, waiver or other alteration would in any way affect the Mortgage Loans or the Company's performance under the Purchase Agreement with respect to the Mortgage Loans without the prior written consent of the Trustee.

<u>Representations and Warranties of the Company</u>

   3. The Company warrants and represents to the Assignor, the Assignee and the Trust as of the date hereof that:

  (a) The Company is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation;

  (b) The Company has full power and authority to execute, deliver and perform its obligations under this Agreement and has full power and authority to perform its obligations under the Purchase Agreement.  The execution by the Company of this Agreement is in the ordinary course of the Company's business and will not conflict with, or result in a breach of, any of the terms, conditions or provisions of the Company's charter or bylaws or any legal restriction, or any material agreement or instrument to which the Company is now a party or by which it is bound, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Company or its property is subject.  The execution, delivery and performance by the Company of this Agreement have been duly authorized by all necessary corporate action on part of the Company.  This Agreement has been duly executed and delivered by the Company, and, upon the due authorization, execution and delivery by the Assignor and the Assignee, will constitute the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except as enforceability may be limited by bankruptcy, reorganization, insolvency, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, and by general principles of equity regardless of whether enforceability is considered in a proceeding in equity or at law;

  (c) No consent, approval, order or authorization of, or declaration, filing or registration with, any governmental entity is required to be obtained or made by the Company in connection with the execution, delivery or performance by the Company of this Agreement; and

  (d) There is no action, suit, proceeding or investigation pending or threatened against the Company, before any court, administrative agency or other tribunal, which would draw into question the validity of this Agreement or the Purchase Agreement, or which, either in any one instance or in the aggregate, would result in any material adverse change in the ability of the Company to perform its obligations under this Agreement or the Purchase Agreement, and the Company is solvent.

4.      Pursuant to <u>Section 13</u> of the Purchase Agreement, the Company hereby represents and warrants, for the benefit of the Assignor, the Assignee and the Trust, that the representations and warranties set forth in <u>Section 9.02</u> of the Purchase Agreement are true and correct as of the date hereof as if such representations and warranties were made on the date hereof unless otherwise specifically stated in such representations and warranties.

<u>Remedies for Breach of Representations and Warranties</u>

5.      The Company hereby acknowledges and agrees that the remedies available to the Assignor, the Assignee and the Trust (including the Trustee and the Servicer acting on the Trust's behalf) in connection with any breach of the representations and warranties made by the Company set forth in Sections 3 and 4 hereof shall be as set forth in <u>Subsection 9.03</u> of the Purchase Agreement as if they were set forth herein (including without limitation the repurchase and indemnity obligations set forth therein).

<u>Miscellaneous</u>

6.      This Agreement shall be construed in accordance with the laws of the State of New York, without regard to conflicts of law principles, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

7.      No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced, with the prior written consent of the Trustee.

8.      This Agreement shall inure to the benefit of (i) the successors and assigns of the parties hereto and (ii) the Trust (including the Trustee and the Servicer acting on the Trust's behalf).  Any entity into which Assignor, Assignee or Company may be merged or consolidated shall, without the requirement for any further writing, be deemed Assignor, Assignee or Company, respectively, hereunder.

9.      Each of this Agreement and the Purchase Agreement shall survive the conveyance of the Mortgage Loans and the assignment of the Purchase Agreement (to the extent assigned hereunder) by Assignor to Assignee and by Assignee to the Trust and nothing contained herein shall supersede or amend the terms of the Purchase Agreement.

10.     This Agreement may be executed simultaneously in any number of counterparts.  Each counterpart shall be deemed to be an original and all such counterparts shall constitute one and the same instrument.

11.     In the event that any provision of this Agreement conflicts with any provision of the Purchase Agreement with respect to the Mortgage Loans, the terms of this Agreement shall control.

12.     Capitalized terms used in this Agreement (including the exhibits hereto) but not defined in this Agreement shall have the meanings given to such terms in the Purchase Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers as of the date first above written.

NC CAPITAL CORPORATION


By: ___ _____
     Name: _____
     Its: _____


SUTTON FUNDING LLC


By: ___ _____
     Name: _____
     Its: _____


[_____]


By: ___ _____
     Name: _____
     Its: _____

<u>EXHIBIT A TO ASSIGNMENT AND RECOGNITION AGREEMENT</u>

**Mortgage Loan Schedule**



**EXECUTION COPY**

AMENDMENT NO. 1

AMENDMENT NO. 1, dated as of December 28, 2006 ("Amendment"), to the Amended and Restated Mortgage Loan Purchase Agreement, dated as of June 1, 2006 (the "Purchase Agreement"), each between SUTTON FUNDING LLC, a Delaware limited liability company, c/o Global Securitization Services, LLC having an office at 445 Broad Hollow Road, Suite 239, Melville, New York 11747 ("Sutton") and NC CAPITAL CORPORATION, a California corporation, having an office at 18400 Von Karman, Suite 1000, Irvine, CA 92612 ("NCC").

RECITALS

WHEREAS, the parties hereto have entered into the Purchase Agreement;

WHEREAS, the parties hereto desire to modify the Purchase Agreement as set forth in this Amendment;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Defined Terms.  Unless otherwise defined herein, terms defined in the Purchase Agreement are used herein as therein defined.

2. Amendment.

Section 9.05 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following language:

"Premium Recapture.  With respect to any Mortgage Loan without a Prepayment Penalty that prepays in full during the first two months following the related Closing Date, the Seller shall pay the Purchaser, within three (3) Business Days after such prepayment in full or repurchase, an amount equal to the excess of the Purchase Price Percentage for such Mortgage Loan over par, multiplied by the outstanding principal balance of such Mortgage Loan as of the related Cut-off Date.

3. Ratification of Agreement.  Except as modified and expressly amended by this Amendment, the Purchase Agreement is in all respects ratified and confirmed, and all the terms, provisions and conditions thereof shall be and remain in full force and effect.

4. Counterparts.  This Amendment may be executed by one or more of the parties hereto on any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

5. Governing Law.  **THIS AMENDMENT SHALL BE GOVERNED BY NEW YORK LAW WITHOUT REFERENCE TO CHOICE OF LAW DOCTRINE.**

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered as of the day and year first above written.

**SUTTON FUNDING LLC**

By: _____
    Name:    Fouad S. Onbargi
    Title:       Director

**NC CAPITAL CORPORATION**

By: _____
    Name:
    Title:

Sutton – New Century (12.2006) Amendment No. 1 to A&R MLPA

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered as of the day and year first above written.

**SUTTON FUNDING LLC**

By: _____
    Name:
    Title:

**NC CAPITAL CORPORATION**

By: _____
    Name: Warren Licata
    Title: SVP



D 3 0 7 9 1 6 3

Client/Matter ID: 97366 / 035
Office: NY
GroupID:
Folder Number:   BF-100-001
Subfolder Number:   2
Document Number: 3-01
Title: Amendment NO. 1, dated August 31, 2006.



E

January 18, 2007

Kevin Cloyd
18400 Von Karman
Suite 1000
Irvine, CA  92612

Dear Kevin:

Barclays Bank PLC or its assignee ("Barclays") is pleased to provide our bid indication for approximately $1.0 billion fixed and adjustable rate residential mortgage loans (the "Mortgage Loans") on a servicing released basis being offered for sale by NC Capital Corp. ("Seller"). Barclays' bid indication is subject to an on-site diligence by Barclays Capital, Inc. The Mortgage Loans will settle on February 14, 2007 and on February 28, 2007, or such other dates as are mutually agreed upon by the Seller and Barclays.  Barclays' bid indication is based upon and subject to the information provided in hard copy and electronic format by Seller and the following provisions:

| | |
|---|---|
| **Indicated Bid Price:** | The bid indication provided verbally will be subject to market adjustments and will be confirmed or adjusted verbally upon final pricing and award of the loans to Barclays by Seller. |
| **Fixed Rate Loan Percentage:** | The pool will be composed of no less than 20% and no more than 21.86% of fixed rate Mortgage Loans. |
| **Pool Amount and Delivery Tolerance:** | The total unpaid principal balance of the Mortgage Loans shall equal to $1.0 billion including a tolerance of + or – 10%. |
| **Material Adverse Change:** | In the event that any material adverse change in the property, business, financial condition or prospects of Seller or any of its affiliates shall occur, in each case as determined by Barclays in its sole reasonable discretion, or any other condition exists which, in Barclays' good faith discretion, constitutes a material impairment of the Seller's ability to perform its obligations as Seller, shall relieve Barclays of any obligation to purchase the Mortgage Loans as described in this letter. |
| **Pool Parameters:** | The parameters of the final pools shall be as described below.  All concentration percentages reflect the principal balance and not the loan count. |

(a) The average outstanding principal balance for the Mortgage Loans is approximately $212,800.

(b) Second lien Mortgage Loans will not exceed 5.83% of the pool.

USActive 7292841.2

(c)  The weighted average gross coupon on the Mortgage Loans is no less than 8.277%.

(d)  The weighted average gross margin of the Mortgage Loans is no less than 6.195%.

(e)  The Mortgage Loans have a weighted average maturity of approximately 359 months and a weighted average of 25 months to next rate adjustment.

(f)  Each of the Mortgage Loans has a final maturity that is not to exceed 30 years.

(g)  No more than 41.88% of the Mortgage Loans are 40 year amortization ARM loans with a 30 year term.

(h)  No more than 6.46% of the Mortgage Loans are 50 year amortization ARM loans with a 30 year term.

(i)  At least 90.05% of the Mortgage Loans are owner occupied primary residences. No more than 7.03% of the Mortgage Loans are investment properties and no more 2.92% of the Mortgage Loans are second homes.

(j)  No more than 51.86% of the Mortgage Loans are cash out refinances. At least 37.54% of the Mortgage Loans are purchases. At least 10.60% of the Mortgage Loans are rate term refinance.

(k)  At least 53.78% of the Mortgage Loans are full documentation loans.  No more than 44.91% of the Mortgage Loans are "Stated" documentation loans.  No more than 1.32% of the Mortgage Loans are "Limited" documentation loans.  No Mortgage Loans are "NINA" documentation loans.

(l)  The weighted average original LTV for the Mortgage Loans shall be no greater than 77.87%.  The weighted average combined LTV shall not exceed 87.72% and no more than 26.98% of the Mortgage Loans have Silent Seconds behind it. No Mortgage Loans shall have any original combined LTV in excess of 100%.

(m)  No payment required under any mortgage loan will be delinquent and no Mortgage Loan shall be 30 or more days delinquent since origination.

(n)  The weighted average FICO score for the Mortgage Loans shall not be less than 625.

(o) No more than 19.53% of the Mortgage Loans will be interest only. All interest only Mortgage Loans will have a 5 year IO term.

(p) The maximum Debt-to-Income ratio for any Mortgage Loans is 55%.

(q) The Mortgage Loans will be secured by no less than 71.32% single family residences.

(r) The maximum allowable property type percentages other than single family detached houses are as follows:

| Property Type | Percentage |
|---------------|------------|
| 2 Family | 6.99% |
| 3 Family | 1.11% |
| 4 Family | 0.85% |
| Condo | 5.72% |
| PUD | 14.00% |
| Townhouse | 0.00% |
| Modular | 0.00% |

(s) A minimum of 69.61% of the Mortgage Loans shall have prepayment penalties as detailed in the data supplied by Seller. A minimum of 14.45% of the Mortgage Loans shall be subject to prepayment penalties for a period of 3 years from the loan origination date. A minimum of 48.07% of the Mortgage Loans shall be subject to prepayment penalties for a period of 2 years from the loan origination date. A minimum of 7.08% of the Mortgage Loans shall be subject to prepayment penalties for a period of 1 year from the loan origination date.

(t) At least 18.55% of the Mortgage Loans shall have an "AAA" credit grade and at least 59.10% of the Mortgage Loans shall have an "AA" credit grade.

(u) The maximum allowable percentages of Mortgage Loans with credit grades lower than "AA" are as follows:

| Credit Grade | Percentage |
|--------------|------------|
| "A+" | 10.91% |
| "A-" | 5.64% |
| "B" | 3.67% |
| "C" | 2.03% |
| "C-" | 0.10% |

**Minimum Balance:**       No first lien Mortgage Loan shall have an unpaid principal balance less than $50,000 and no second lien Mortgage Loan shall have an unpaid principal balance less than $15,000.

| | |
|---|---|
| **Servicing:** | Seller is the sole interim servicer of all Mortgage Loans. |
| | Any prepayment penalty collected will be remitted to Barclays. Prepayment penalty fees will not be waived. Such collected amounts will be deposited into the custodial account and remitted to Barclays with the regular remittance. Late fees and other ancillary fees shall be retained by the servicer. |
| | In the event Barclays securitizes the Mortgage Loans, Barclays or a third party will be responsible for performing all REMIC reporting and tax payment at no cost to the Seller. |
| **First Payment Default:** | All payments required to be made up to the closing date for the Mortgage Loan under the terms of the mortgage note, other than payments not yet 30 days delinquent, have been made and credited. No payment required under the Mortgage Loan is 30 days or more delinquent nor has any payment under the Mortgage Loan been 30 days or more delinquent at any time since the origination of the Mortgage Loan. Seller agrees to repurchase at the purchase price each Mortgage Loan for which the first monthly payment is not paid before the first day of the month immediately following the month in which the first contractual payment was due. Notwithstanding the foregoing, Seller shall have a period of 45 days from the Due Date to cure such delinquency. |
| **Premium Protection:** | Seller will reimburse the amount paid over par for all loans without prepayment penalties that prepay in full for a period of 2 months after the closing date. This premium protection will terminate in the event Barclays securitizes the Mortgage Loans. |
| **Repurchase for Breach of Representations and Warranties:** | On any mortgage loan that has been repurchased by Seller for a breach of a representations or warranty, Seller shall pay Barclays the Repurchase Price as defined in the related purchase price and terms agreement. |
| **Interest:** | All loans shall pay interest in arrears and shall not be calculated on a simple interest basis. |
| **Sale Documents:** | A mortgage loan purchase agreement provided by the Barclays will govern, with changes to be agreed upon between Barclays and the Seller. |
| **Pair-off Fee:** | At Barclays' sole discretion, Barclays may accept delivery of less than 90% of the $1.0 billion pool amount. In the event that the Seller delivers Mortgage Loans with an unpaid principal balance that is less than $900 million, the Seller shall pay Barclays a pair-off for the difference between the actual amount delivered and $900 million. Such a pair-off fee shall be equal to any decrease in basis points on the yield of the |