interpolated 2 year Swap rate (as set on the trade date) times the product of 1.5 and the unpaid principal balance of the Mortgage Loans as of the settlement date.

**Securitization:**

In the event Barclays exits the loans thorough a securitization, Seller agrees to cooperate fully with any third party insurer, monitor or master servicer, as deemed appropriate in the securitization, and in any servicing transfer at no cost to Barclays or any other third party; provided, that the foregoing shall be limited to four securitizations per mortgage loan pool. The Seller will also agree that it will, in the event the Purchaser securitizes the Mortgage Loans, (i) provide necessary disclosure, including, without limitation, disclosure regarding the Seller's company, portfolio performance, and underwriting procedures; (ii) restate on the date of any securitization the representations and warranties regarding itself and the individual mortgage loans with such modifications as are necessary to reflect events occurring between the closing date and the reconstitution date (including any servicing transfer from Seller to Purchaser or its assignee) but only if the date of securitization is within 6 months of the settlement of Barclays' final purchase of the loans from the Seller; (iii) jointly and severally with any affiliate thereof acceptable to the Purchaser agree (A) to indemnify and hold harmless the Purchaser, each affiliate designated by the Purchaser and each person who controls the Purchaser or such affiliate from and against any and all losses, claims, damages and liabilities arising from any untrue statement or alleged untrue statement of a material fact contained in any information with respect to the Seller, its affiliate, its business or the Mortgage Loans (as further described in the mortgage loan purchase agreement, the "Seller Information") in the related offering documents, including collateral term sheets and computational materials, or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, and (B) if such indemnification were not available, to contribute to such losses, claims, damages and liabilities in proportion to their relative benefit and fault, in which case relative benefit for the Seller, and the persons related thereto, will be measured relative to the Purchase Price and the relative benefit of the Purchaser and the persons related thereto, will be measured relative to the underwriting discount received in connection with the securitization; and (iv) perform all other things reasonably required for securitization. Barclays will reimburse to the Seller up to $15,000 of the Seller's out-of-pocket expenses incurred in connection with a securitization of the Mortgage Loans by Barclays.

This letter is not intended to be, and shall not constitute a commitment or undertaking by Barclays to purchase the Mortgage Loans whether on a principal or agency basis other than and subject to the terms and conditions set forth herein.

We appreciate the opportunity to participate in this transaction and look forward to working together in the future.

Sincerely,


Paul Menefee
Director



**EXECUTION COPY**

As of January 18, 2007

NC Capital Corporation
New Century Mortgage Corporation
210 Commerce Street
Irvine, California  92612

Attention:  Kevin Cloyd

Re:    Purchase Price and Terms Agreement

Dear Mr. Cloyd:

Barclays Bank PLC or its assignee (the "Purchaser") hereby confirms its agreement to purchase and NC Capital Corporation (the "Seller") hereby confirms its agreement to sell, on a mandatory delivery basis, certain fixed and adjustable rate, first and second lien, residential mortgage loans described herein (the "Mortgage Loans") on a servicing released basis, on the terms and conditions set forth below.

In addition to this Purchase Price and Terms Agreement (which incorporates the terms set forth in the bid letter attached as Exhibit A hereto (the "Bid Letter")), the Amended and Restated Mortgage Loan Purchase Agreement, dated as of June 1, 2006, as amended by Amendment No. 1, to be dated as of December 28, 2006 (the "Purchase Agreement"), between the Seller and the Purchaser, and the Interim Servicing Agreement, dated as of January 1, 2006 (the "Servicing Agreement"), between the Purchaser and New Century Mortgage Corporation ("NCMC") shall set forth the terms and provisions with respect to the Mortgage Loans and the sale and servicing thereof.  The Mortgage Loans will be conveyed by the Seller to the Purchaser pursuant to an Assignment and Conveyance, to be dated as of the related Closing Date (as defined below) (the "Assignment and Conveyance").

Ownership of the Mortgage Loans shall be evidenced by delivery of the Mortgage Loans as whole loans pursuant to this Purchase Price and Terms Agreement, the Purchase Agreement and the Servicing Agreement.

1.    Term of this Commitment

The Mortgage Loans shall be purchased by the Purchaser and sold by the Seller, subject to the terms hereof and the Bid Letter, on February 14, 2007 and February 28, 2007, or such other dates as shall be mutually agreed upon by the parties hereto (each, a "Closing Date"). Notwithstanding the foregoing and prior to the Closing Dates, in the event that there is a material adverse change to (a) the Property, business, operations, financial condition or prospects of the Seller or any of its affiliates, (b) the ability of the Seller or any of its affiliates to perform its obligations under any of this Purchase Price and Terms Agreement, the Purchase Agreement or the Servicing Agreement or (c) the Mortgage Loans as a whole, in each case as determined in good faith by the Purchaser in its sole reasonable discretion, or any other condition exists which,

in the Purchaser's sole discretion, constitutes a material impairment of the Seller's ability to perform its obligation as Seller hereunder or under the Purchase Agreement or the Servicing Agreement, the Purchaser shall be relieved of any obligation to purchase any Mortgage Loans.

When used in this Section 1, the term "Property" shall mean any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

In addition, the obligation of the Purchaser to purchase any Mortgage Loan from the Seller on the Closing Dates is expressly contingent upon the satisfactory due diligence review by the Purchaser to confirm that such Mortgage Loan conforms to the terms of this Purchase Price and Terms Agreement and conforms to the underwriting guidelines of the Seller, as further described in the Bid Letter.

2.  Aggregate Amount of Mortgage Loans

The aggregate outstanding principal balance as of February 1, 2007 (the "Cut-off Date") of the Mortgage Loans shall be approximately $1,000,000,000. Notwithstanding the foregoing, the Purchaser, in its sole discretion, may accept delivery of less than 90% of the $1,000,000,000 pool amount. In the event that the Seller delivers Mortgage Loans with an aggregate outstanding principal balance that is less than $900,000,000 the Seller shall pay the Purchaser a pair-off fee (as described in the Bid Letter) for the difference between the actual amount delivered (in the aggregate) and $900,000,000.

3.  Purchase Price

The purchase price for the Mortgage Loans sold to the Purchaser on the Closing Dates (which includes the related servicing rights) (the "Purchase Price") shall be equal to the product of (i) the Purchase Price Percentage (as defined below) and (ii) the aggregate outstanding principal balance of the Mortgage Loans as of the Cut-off Date, after application of payments due on the Mortgage Loans on or before the Cut-off Date, to the extent such payments were actually received (the "Cut-off Date Aggregate Pool Balance"), plus accrued and unpaid interest on the Mortgage Loans at the weighted average mortgage interest rate (net of the Servicing Fee Rate) from the interest paid to date through the day prior to the Closing Dates, inclusive. In the event the characteristics and parameters of the Mortgage Loans as described in Section 4 change prior to the Closing Dates, the Seller and Purchaser shall negotiate in good faith to recalculate the Purchase Price Percentage.

The "Purchase Price Percentage" with respect to the Mortgage Loans shall be equal to 102.025% subject to adjustment as described below. Notwithstanding the foregoing sentence, the Purchase Price Percentage shall be adjusted up or down per the following table for every basis point (0.01%) by which the weighted average interest rate of the Mortgage Loans (the "Weighted Average Gross Coupon") as of the Cut-off Date exceeds or falls below a rate equal to 8.28%.

| Weighted Average Gross Coupon ("GWAC") Range | Adjustment to Mortgage Loan Price Percentage per 0.01% (1 bp) change in GWAC |
|---|---|
| > 8.28% | 1.50 bps up |
| = 8.28% | none |
| < 8.28% | 1.50 bps down |

The Purchase Price for the Mortgage Loans shall be paid to the Seller on the Closing Dates in immediately available funds by wire transfer to an account designated by the Seller in writing.

4.   The Mortgage Loans

The Mortgage Loans will have the applicable characteristics set forth in the Bid Letter.  The Seller shall make the representations and warranties to be set forth in the Purchase Agreement, as of the related Closing Date.  In addition, Seller agrees that (i) the Mortgage Loans shall be selected from among the outstanding one- to four-family mortgage loans in the Seller's portfolio on the Cut-off Date as to which the representations and warranties set forth in the Purchase Agreement can be made, (ii) such selection will not be made in a manner so as to affect adversely the interests of the Purchaser, (iii) no Mortgage Loan will be a "High Cost Loan" where High Cost Loan means a Mortgage Loan classified as (a) a "high cost" loan under the Home Ownership and Equity Protection Act of 1994 or (b) a "high cost home," "threshold," "covered", "high risk home", "predatory" or similar loan under any other applicable state, federal or local law (or a similarly classified loan using different terminology under a law imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees), (iv) no Mortgage Loan will be secured by mortgaged property located in the State of Georgia if originated on or after October 1, 2002 and on or prior to March 7, 2003, (v) no Mortgage Loan has a debt-to-income ratio greater than 60%, and (vi) no Mortgage Loan originated on or after August 1, 2004 requires the related mortgagor to submit to arbitration to resolve any dispute arising out of or relating in any way to the Mortgage Loan transaction.

5.   Servicing

The Servicing Rights with respect to the Mortgage Loans shall be assigned and transferred to the Purchaser on the related Closing Date.  The Mortgage Loans shall be serviced by NCMC or its assignee on behalf of the Purchaser and its assignees pursuant to the Servicing Agreement from and after the Closing Dates and until April 30, 2007 or such other date as mutually agreed upon by the Seller, the Purchaser and NCMC (the "Servicing Transfer Date").  At such time the Seller shall cooperate to effect a Complete Servicing Transfer with respect to the Mortgage Loans.  A "Complete Servicing Transfer" shall include the following: (i) the Seller shall have fully complied with the servicing transfer provisions contained in the Purchase Agreement and the Servicing Agreement; (ii) the Seller shall have provided the Purchaser or its designee with a complete servicing file with respect to each of the Mortgage Loans; and (iii) the Seller shall have provided the Purchaser or its designee with a complete and accurate servicing tape with respect to each of the Mortgage Loans.

Pursuant to the Servicing Agreement, NCMC shall be entitled to receive, from interest actually collected on each Mortgage Loan, a servicing fee (the "Servicing Fee") with respect to each Mortgage Loan in an amount equal to one-twelfth of the product of (a) the Servicing Fee Rate (50 basis points (0.50%) per annum) and (b) the scheduled principal balance of such Mortgage Loan payable monthly during any month NCMC acts as servicer with respect to such Mortgage Loan. The Servicing Fee shall be pro-rated (based upon the number of days of the related month NCMC so acted as servicer, expressed as a percentage of such month) for each part thereof. NCMC acknowledges and agrees that the Servicing Fee represents normal compensation for performing such services and that the entire Servicing Fee shall be treated by NCMC, for accounting and tax purposes, as compensation for the servicing and administration of the Mortgage Loans pursuant to the Servicing Agreement.

6.   Tax Service Contracts; Flood Certification Contracts

The Seller shall ensure that each of the first lien Mortgage Loans shall be covered by a paid-in-full, life-of-loan tax service contract (each, a "Tax Service Contract"), and that each of the Mortgage Loans are covered by a paid-in-full, life-of-loan, flood certification contract (each, a "Flood Certification Contract"), each issued by FNIS and each of which shall be assigned to the Purchaser or the Purchaser's designee at the Seller's expense. The obligations set forth in this Section 6 shall survive the closing of the transaction contemplated hereby, shall not merge with the closing documents and shall be independently enforceable.

7.   Purchase Agreement; Servicing Agreement

The Purchase Agreement and the Servicing Agreement each sets forth additional representations and warranties to be made as of the related Closing Date (the "Representations and Warranties") and requires the Seller, at the Purchaser's option, to repurchase any Mortgage Loan with respect to which a material breach of a Representation and Warranty is discovered and cannot be cured (a "Loan in Breach") at the Repurchase Price (defined below).

Notwithstanding anything to the contrary set forth in the Purchase Agreement or in the Servicing Agreement, the price for such repurchase (the "Repurchase Price") with respect to any Loan in Breach shall be with respect to any Mortgage Loan that becomes a Loan in Breach (a) during the first year immediately following the related Closing Date, provided that the Loan in Breach in not subject to a Securitization Transaction, an amount equal to the Purchase Price Percentage multiplied by the then outstanding principal balance of such Loan in Breach as of the date of such repurchase (including, without duplication, the amount of any outstanding advances owed to any servicer), plus accrued interest on such Loan in Breach at the mortgage interest rate from the date on which interest had last been paid through the date of such repurchase (but not more than 90 days of accrued and unpaid interest), plus all reasonable and necessary costs and expenses incurred by the Purchaser arising out of or based upon such breach, including without limitation costs and expenses incurred in the enforcement of the Seller's repurchase obligation thereunder, and (b) thereafter, an amount equal to the then outstanding principal balance of such Loan in Breach as of the date of such repurchase plus accrued interest thereon at the mortgage interest rate from the date to which interest had last been paid through the date of such repurchase (but not more than 90 days of accrued and unpaid interest), plus the amount of any outstanding advances owed to any servicer, plus all costs and expenses incurred

by the Purchaser arising out of or based upon such breach, including without limitation costs and expenses incurred in the enforcement of the Seller's repurchase obligation thereunder.   The limitation on accrued interest described above shall not apply in connection with the first payment default provision set forth below and in Section 9.04 of the Purchase Agreement.  In the event of a securitization of any of the Mortgage Loans by the Purchaser or any of its affiliates, the Repurchase Price for such a Loan in Breach shall be as set forth in clause (b) above.

With respect to each Mortgage Loan, in the event that the first payment to be made by the mortgagor on the first due date after the related Closing Date with respect to any Mortgage Loan is not paid before the first day of the month following such due date, the Seller, at the Purchaser's option, shall repurchase such Mortgage Loan at the Repurchase Price. Notwithstanding the foregoing, the Seller shall have a period of forty-five (45) days following such first due date to cure any such delinquency.   The Purchaser shall notify the Seller and request a repurchase within sixty (60) days after the mortgagor's failure to make such payment (including such additional cure period) and the Seller shall repurchase such Mortgage Loan within five (5) business days of the receipt of such notice.

With respect to Mortgage Loans without prepayment penalties, in the event that any such Mortgage Loan prepays in full within the two (2) months immediately following the related Closing Date, the Seller shall pay the Purchaser, within three (3) business days of such prepayment in full, the Purchase Price for such Mortgage Loan, as set forth herein, less the outstanding principal balance of such Mortgage Loans as of the Cut-off Date.

The repurchase price provisions set forth in this Section 7 shall survive the Closing Dates and shall not merge with the closing documents, but instead shall be independently enforceable by the Purchaser.

8.   Custody of Mortgage Loan Documents

Pursuant to the Custodial Agreement, dated as of January, 1, 2006 (the "Custodial Agreement"), among the Purchaser, Deutsche Bank National Trust Company (the "Custodian"), NCMC and the Seller, the Seller shall deliver to the Custodian all original documents with respect to each Mortgage Loan, as set forth in the Custodial Agreement.  Such documents will be held by the Custodian in trust for the benefit of the Purchaser, and the Seller shall pay all costs associated with the shipment of the files to the Custodian prior to the Closing Dates.   The Purchaser shall pay the costs and expenses of the Custodian.  The Seller shall pay any fees or costs incurred in connection with a one-time preparation of each assignment in blank.

9.   Review of Loan Files

The Seller shall make up to twenty-five percent (25%) of the Mortgage Loan files (based on loan count), together with the related credit and servicing files (including, without limitation, the related mortgagor's payment history), available at its offices for review during normal business hours and mutually agreed upon date(s) prior to the Closing Dates.   The Purchaser, or its designee, may review the Mortgage Loan files prior to the Closing Dates for the purpose of ensuring conformity with the terms of this Purchase Price and Terms Agreement and the Purchase Agreement.  If the Purchaser makes such examination prior to the Closing Dates

USActive 7292720.3                                    -5-

and identifies any Mortgage Loan which does not conform to the Purchaser's requirements, in its sole discretion, such Mortgage Loan shall be deleted from the Mortgage Loan schedule to be delivered to the Purchaser on the related Closing Date.

The Purchaser may, at its option and without notice to the Seller, purchase all or part of the Mortgage Loans without conducting any partial or complete examination. The fact that the Purchaser or any prospective purchaser of the Mortgage Loans has conducted or has failed to conduct any partial or complete examination of the Mortgage Loan files shall not affect the Purchaser's (or any of its successors') rights to demand repurchase, substitution or other relief as provided under the Purchase Agreement.

10. Securitization

In the event of a securitization of the Mortgage Loans by the Purchaser or any of its affiliates, the Seller, NCMC and the Purchaser shall comply with the provisions relating to securitizations set forth in the Bid Letter.

11. Intention of the Parties

It is the intention of the parties that the Purchaser is purchasing, and the Seller is selling, interests in the Mortgage Loans and not a debt instrument of the Seller or other security. Accordingly, each party intends to treat the transaction for federal income tax purposes as a sale by the Seller, and a purchase by the Purchaser, of an ownership interest (the "Ownership Interest") in the Mortgage Loans. Moreover, the arrangement under which the Mortgage Loans are held will be consistent with the classification of such arrangement as a grantor trust in the event it is not found to represent direct ownership of the related Ownership Interest in the Mortgage Loans. The Purchaser shall have the right to review the Mortgage Loans and the related Mortgage Loan files to determine the characteristics of the Mortgage Loans which will affect the federal income tax consequences of owning the Ownership Interest in the Mortgage Loans and the Seller shall cooperate with all reasonable requests made by the Purchaser in the course of such review.

12. Costs

The Purchaser shall pay any commissions due its salesmen, the legal fees and expenses of its attorneys, fees for recording each Assignment of Mortgage, shipping costs for delivery of the physical Servicing File and the costs and expenses of the Custodian (including shipping fees incurred following the Closing Dates). Except as otherwise specified herein, all other costs and expenses incurred in connection with the transaction contemplated hereby, fees for title policy endorsements and continuations and the Seller's attorney's fees shall be paid by the Seller.

13. Confidential Information

The Purchaser and the Seller shall keep confidential and shall not divulge to any non-affiliated person, without the other's prior written consent, the price paid by the Purchaser for the Mortgage Loans, except to the extent that it is appropriate for the Purchaser or the Seller, as the case may be, to do so in working with legal counsel, auditors, taxing authorities or other

governmental agencies. The rights and obligations set forth in this Section shall survive the Closing Dates and shall not merge with or into any of the closing documents described herein, but instead shall be independently enforceable.

## 14. Brokerage Fees

Neither the Seller nor the Purchaser has employed or used a broker in connection with the transactions contemplated herein, and to the extent that a demand is made upon either the Seller or the Purchaser for brokerage fees associated herewith, neither the Seller nor the Purchaser shall be responsible for paying any brokerage fees of the other party. Each party hereto shall indemnify and hold the other party harmless against all claims of any brokers or other persons employed or used by the first party for brokers' commissions relating thereto, which indemnification shall include all losses, damages and expenses, including attorney's fees for settlement, litigation or appearance and other costs for same, suffered by such other party in connection with such claims. The rights and obligations set forth in the preceding sentence shall survive the Closing Dates and shall not merge with or into any of the closing documents described herein, but instead shall be independently enforceable.

## 15. Notices

All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, return receipt requested, or if by other means, when received by the other party at the address shown on the first page hereof, or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

## 16. **Governing Law**

**This Purchase Price and Terms Agreement shall be deemed in effect when a fully executed counterpart thereof is received by the Purchaser in the State of New York and shall be deemed to have been made in the State of New York. This Purchase Price and Terms Agreement shall be construed in accordance with the substantive laws of the State of New York without regard to conflicts of law principles.**

## 17. Further Agreements

The Purchaser and the Seller each agree to execute and deliver to the other such additional documents, instruments or agreements that may be necessary or appropriate to effectuate the purposes and intent of this Purchase Price and Terms Agreement.

## 18. Entire Agreement and Amendments

This Purchase Price and Terms Agreement contains the entire agreement relating to the subject matter hereof between the Seller and the Purchaser and supersedes any prior oral or written agreement between the Seller and the Purchaser. This Purchase Price and Terms

Agreement may only be amended by a written document signed by both the Seller and the Purchaser.

**[SIGNATURES COMMENCE ON THE FOLLOWING PAGE]**



Kindly acknowledge receipt of this confirmation by signing and promptly returning the enclosed duplicate of this letter on or before January 17, 2006. Your failure to return a countersigned duplicate of this letter to us within the time indicated shall give us the right, at our sole option, to declare the oral agreement confirmed hereby null and void.

Very truly yours,

SUTTON FUNDING LLC

By: _____

Name:     **Janette Lieu**

Title:      **Director**

Receipt of this confirmation is
   hereby acknowledged:

NC CAPITAL CORPORATION

By:_____

   Name:

   Title:

   Date:

NEW CENTURY MORTGAGE CORPORATION

By:_____

   Name:

   Title:

   Date:

Kindly acknowledge receipt of this confirmation by signing and promptly returning the enclosed duplicate of this letter on or before January 17, 2006. Your failure to return a countersigned duplicate of this letter to us within the time indicated shall give us the right, at our sole option, to declare the oral agreement confirmed hereby null and void.

Very truly yours,

SUTTON FUNDING LLC

By:_____

    Name:

    Title:

Receipt of this confirmation is
    hereby acknowledged:

NC CAPITAL CORPORATION

By:_____

    Name:   Kevin Cloyd

    Title:   President

    Date:

NEW CENTURY MORTGAGE CORPORATION

By:_____

    Name:

    Title:   KEVIN CLOYD

             EXECUTIVE VICE PRESIDENT

    Date:

January 18, 2007

Kevin Cloyd
18400 Von Karman
Suite 1000
Irvine, CA 92612

Dear Kevin:

Barclays Bank PLC or its assignee ("Barclays") is pleased to provide our bid indication for approximately $1.0 billion fixed and adjustable rate residential mortgage loans (the "Mortgage Loans") on a servicing released basis being offered for sale by NC Capital Corp. ("Seller"). Barclays' bid indication is subject to an on-site diligence by Barclays Capital, Inc. The Mortgage Loans will settle on February 14, 2007 and on February 28, 2007, or such other dates as are mutually agreed upon by the Seller and Barclays. Barclays' bid indication is based upon and subject to the information provided in hard copy and electronic format by Seller and the following provisions:

| | |
|---|---|
| **Indicated Bid Price:** | The bid indication provided verbally will be subject to market adjustments and will be confirmed or adjusted verbally upon final pricing and award of the loans to Barclays by Seller. |
| **Fixed Rate Loan Percentage:** | The pool will be composed of no less than 20% and no more than 21.86% of fixed rate Mortgage Loans. |
| **Pool Amount and Delivery Tolerance:** | The total unpaid principal balance of the Mortgage Loans shall equal to $1.0 billion including a tolerance of + or – 10%. |
| **Material Adverse Change:** | In the event that any material adverse change in the property, business, financial condition or prospects of Seller or any of its affiliates shall occur, in each case as determined by Barclays in its sole reasonable discretion, or any other condition exists which, in Barclays' good faith discretion, constitutes a material impairment of the Seller's ability to perform its obligations as Seller, shall relieve Barclays of any obligation to purchase the Mortgage Loans as described in this letter. |
| **Pool Parameters:** | The parameters of the final pools shall be as described below. All concentration percentages reflect the principal balance and not the loan count. |

      (a) The average outstanding principal balance for the Mortgage Loans is approximately $212,800.

      (b) Second lien Mortgage Loans will not exceed 5.83% of the pool.

(c)  The weighted average gross coupon on the Mortgage Loans is no less than 8.277%.

(d)  The weighted average gross margin of the Mortgage Loans is no less than 6.195%.

(e)  The Mortgage Loans have a weighted average maturity of approximately 359 months and a weighted average of 25 months to next rate adjustment.

(f)  Each of the Mortgage Loans has a final maturity that is not to exceed 30 years.

(g)  No more than 41.88% of the Mortgage Loans are 40 year amortization ARM loans with a 30 year term.

(h)  No more than 6.46% of the Mortgage Loans are 50 year amortization ARM loans with a 30 year term.

(i)  At least 90.05% of the Mortgage Loans are owner occupied primary residences. No more than 7.03% of the Mortgage Loans are investment properties and no more 2.92% of the Mortgage Loans are second homes.

(j)  No more than 51.86% of the Mortgage Loans are cash out refinances. At least 37.54% of the Mortgage Loans are purchases. At least 10.60% of the Mortgage Loans are rate term refinance.

(k)  At least 53.78% of the Mortgage Loans are full documentation loans. No more than 44.91% of the Mortgage Loans are "Stated" documentation loans. No more than 1.32% of the Mortgage Loans are "Limited" documentation loans. No Mortgage Loans are "NINA" documentation loans.

(l)  The weighted average original LTV for the Mortgage Loans shall be no greater than 77.87%. The weighted average combined LTV shall not exceed 87.72% and no more than 26.98% of the Mortgage Loans have Silent Seconds behind it. No Mortgage Loans shall have any original combined LTV in excess of 100%.

(m)  No payment required under any mortgage loan will be delinquent and no Mortgage Loan shall be 30 or more days delinquent since origination.

(n)  The weighted average FICO score for the Mortgage Loans shall not be less than 625.

(o)  No more than 19.53% of the Mortgage Loans will be interest only. All interest only Mortgage Loans will have a 5 year IO term.

(p)  The maximum Debt-to-Income ratio for any Mortgage Loans is 55%.

(q)  The Mortgage Loans will be secured by no less than 71.32% single family residences.

(r)  The maximum allowable property type percentages other than single family detached houses are as follows:

| Property Type | Percentage |
|---|---|
| 2 Family | 6.99% |
| 3 Family | 1.11% |
| 4 Family | 0.85% |
| Condo | 5.72% |
| PUD | 14.00% |
| Townhouse | 0.00% |
| Modular | 0.00% |

(s)  A minimum of 69.61% of the Mortgage Loans shall have prepayment penalties as detailed in the data supplied by Seller. A minimum of 14.45% of the Mortgage Loans shall be subject to prepayment penalties for a period of 3 years from the loan origination date. A minimum of 48.07% of the Mortgage Loans shall be subject to prepayment penalties for a period of 2 years from the loan origination date. A minimum of 7.08% of the Mortgage Loans shall be subject to prepayment penalties for a period of 1 year from the loan origination date.

(t)  At least 18.55% of the Mortgage Loans shall have an "AAA" credit grade and at least 59.10% of the Mortgage Loans shall have an "AA" credit grade.

(u)  The maximum allowable percentages of Mortgage Loans with credit grades lower than "AA" are as follows:

| Credit Grade | Percentage |
|---|---|
| "A+" | 10.91% |
| "A-" | 5.64% |
| "B" | 3.67% |
| "C" | 2.03% |
| "C-" | 0.10% |



**Minimum Balance:** No first lien Mortgage Loan shall have an unpaid principal balance less than $50,000 and no second lien Mortgage Loan shall have an unpaid principal balance less than $15,000.

| | |
|---|---|
| **Servicing:** | Seller is the sole interim servicer of all Mortgage Loans. |
| | Any prepayment penalty collected will be remitted to Barclays. Prepayment penalty fees will not be waived. Such collected amounts will be deposited into the custodial account and remitted to Barclays with the regular remittance. Late fees and other ancillary fees shall be retained by the servicer. |
| | In the event Barclays securitizes the Mortgage Loans, Barclays or a third party will be responsible for performing all REMIC reporting and tax payment at no cost to the Seller. |
| **First Payment Default:** | All payments required to be made up to the closing date for the Mortgage Loan under the terms of the mortgage note, other than payments not yet 30 days delinquent, have been made and credited. No payment required under the Mortgage Loan is 30 days or more delinquent nor has any payment under the Mortgage Loan been 30 days or more delinquent at any time since the origination of the Mortgage Loan. Seller agrees to repurchase at the purchase price each Mortgage Loan for which the first monthly payment is not paid before the first day of the month immediately following the month in which the first contractual payment was due. Notwithstanding the foregoing, Seller shall have a period of 45 days from the Due Date to cure such delinquency. |
| **Premium Protection:** | Seller will reimburse the amount paid over par for all loans without prepayment penalties that prepay in full for a period of 2 months after the closing date. This premium protection will terminate in the event Barclays securitizes the Mortgage Loans. |
| **Repurchase for Breach of Representations and Warranties:** | On any mortgage loan that has been repurchased by Seller for a breach of a representations or warranty, Seller shall pay Barclays the Repurchase Price as defined in the related purchase price and terms agreement. |
| **Interest:** | All loans shall pay interest in arrears and shall not be calculated on a simple interest basis. |
| **Sale Documents:** | A mortgage loan purchase agreement provided by the Barclays will govern, with changes to be agreed upon between Barclays and the Seller. |
| **Pair-off Fee:** | At Barclays' sole discretion, Barclays may accept delivery of less than 90% of the $1.0 billion pool amount. In the event that the Seller delivers Mortgage Loans with an unpaid principal balance that is less than $900 million, the Seller shall pay Barclays a pair-off for the difference between the actual amount delivered and $900 million. Such a pair-off fee shall be equal to any decrease in basis points on the yield of the |

interpolated 2 year Swap rate (as set on the trade date) times the product of 1.5 and the unpaid principal balance of the Mortgage Loans as of the settlement date.

**Securitization:**

In the event Barclays exits the loans thorough a securitization, Seller agrees to cooperate fully with any third party insurer, monitor or master servicer, as deemed appropriate in the securitization, and in any servicing transfer at no cost to Barclays or any other third party; provided, that the foregoing shall be limited to four securitizations per mortgage loan pool. The Seller will also agree that it will, in the event the Purchaser securitizes the Mortgage Loans, (i) provide necessary disclosure, including, without limitation, disclosure regarding the Seller's company, portfolio performance, and underwriting procedures; (ii) restate on the date of any securitization the representations and warranties regarding itself and the individual mortgage loans with such modifications as are necessary to reflect events occurring between the closing date and the reconstitution date (including any servicing transfer from Seller to Purchaser or its assignee) but only if the date of securitization is within 6 months of the settlement of Barclays' final purchase of the loans from the Seller; (iii) jointly and severally with any affiliate thereof acceptable to the Purchaser agree (A) to indemnify and hold harmless the Purchaser, each affiliate designated by the Purchaser and each person who controls the Purchaser or such affiliate from and against any and all losses, claims, damages and liabilities arising from any untrue statement or alleged untrue statement of a material fact contained in any information with respect to the Seller, its affiliate, its business or the Mortgage Loans (as further described in the mortgage loan purchase agreement, the "Seller Information") in the related offering documents, including collateral term sheets and computational materials, or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, and (B) if such indemnification were not available, to contribute to such losses, claims, damages and liabilities in proportion to their relative benefit and fault, in which case relative benefit for the Seller, and the persons related thereto, will be measured relative to the Purchase Price and the relative benefit of the Purchaser and the persons related thereto, will be measured relative to the underwriting discount received in connection with the securitization; and (iv) perform all other things reasonably required for securitization. Barclays will reimburse to the Seller up to $15,000 of the Seller's out-of-pocket expenses incurred in connection with a securitization of the Mortgage Loans by Barclays.

This letter is not intended to be, and shall not constitute a commitment or undertaking by Barclays to purchase the Mortgage Loans whether on a principal or agency basis other than and subject to the terms and conditions set forth herein.

We appreciate the opportunity to participate in this transaction and look forward to working together in the future.

Sincerely,


Paul Menefee
Director



G

## Index Of State Court Documents

1.    01/14/2008    Case Docket Sheet for  Case No. DC-08-00398

2.    01/14/2008    Plaintiffs' Original Petition

3.    01/14/2008    Jury Demand by Plaintiff

4.    01/17/2008    Return of Service on Barclays Bank PLC

5.    01/17/2008    Return of Service on Barclays Capital Inc.

6.    2/13/2008     Rule 11 Agreement



# CASE SUMMARY
## CASE NO. DC-08-00398

| | | |
|---|---|---|
| LONE STAR FUND V (US) LP et al | § | Location: **95th District Court** |
| vs. | § | Judicial Officer: **JOHNSON, KAREN** |
| BARCLAYS BANK PLC et al | § | Filed on: **01/14/2008** |
| | § | |

---

### CASE INFORMATION

Case Type: **COMMERCIAL DISPUTE**
Sub Type: **SECURITIES/STOCK**

---

### PARTY INFORMATION

| | | Lead Attorneys |
|---|---|---|
| **PLAINTIFF** | **LONE STAR FUND V (US) LP** | **HIRSCHMAN, KAREN** 214-220-7795 **LEE** *Retained* |
| | **LSF5 BOND HOLDINGS LLC** | |
| **DEFENDANT** | **BARCLAYS BANK PLC** | |
| | **BARCLAYS CAPITAL INC** | |

---

| DATE | EVENTS & ORDERS OF THE COURT | INDEX |
|---|---|---|
| 01/14/2008 | ORIGINAL PETITION (OCA) | |
| 01/14/2008 | ISSUE CITATION | |
| 01/14/2008 | ISSUE CITATION | |
| 01/14/2008 | ISSUE CITATION COMM OF INS OR SOS | |
| 01/14/2008 | **CITATION** BARCLAYS BANK PLC  served  01/15/2008 *1CIT-ATTY BARCLAYS BANK* | |
| 01/14/2008 | **CITATION** BARCLAYS CAPITAL INC  served  01/15/2008 *1 CIT-ATTY, BARCLAY CAPITAL* | |
| 01/14/2008 | **CITATION SOS/COI/COH/HAG** BARCLAYS CAPITAL INC  unserved *1 CIT BARCLAY CAPITAL-ATTY* | |
| 01/14/2008 | JURY DEMAND (OCA)  Party:  PLAINTIFF LONE STAR FUND V (US) LP | *Vol./Book J24, Page192, 1 pages* |
| 02/13/2008 | RULE 11 | |

---

| DATE | FINANCIAL INFORMATION | |
|---|---|---|
| | **PLAINTIFF** LONE STAR FUND V (US) LP | |
| | Total Charges | 280.00 |
| | Total Payments and Credits | 280.00 |
| | **Balance Due as of 2/13/2008** | **0.00** |

*Printed on 02/13/2008 at 10:55 AM*

**GARY FITZSIMMONS, DISTRICT CLERK**

# CASE SUMMARY
## CASE NO. DC-08-00398

| | | | | |
|---|---|---|---|---|
| 01/14/2008 | Charge | | PLAINTIFF LONE STAR FUND V (US) LP | 222.00 |
| 01/14/2008 | Charge | | PLAINTIFF LONE STAR FUND V (US) LP | 24.00 |
| 01/14/2008 | PAYMENT (CASE FEES) | Receipt # 2369-2008-DCLK | PLAINTIFF LONE STAR FUND V (US) LP | (268.00) |
| 01/14/2008 | Adjustment | | PLAINTIFF LONE STAR FUND V (US) LP | (24.00) |
| 01/14/2008 | Charge | | PLAINTIFF LONE STAR FUND V (US) LP | 28.00 |
| 01/14/2008 | Charge | | PLAINTIFF LONE STAR FUND V (US) LP | 30.00 |
| 01/14/2008 | PAYMENT (CASE FEES) | Receipt # 2394-2008-DCLK | PLAINTIFF LONE STAR FUND V (US) LP | (12.00) |

*Printed on 02/13/2008 at 10:55 AM*



CAUSE NO. 0800398

| | | |
|---|---|---|
| LONE STAR FUND V (U.S.), L.P. and | § | IN THE DISTRICT COURT OF |
| LSF5 BOND HOLDINGS, LLC, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| BARCLAYS BANK PLC and | § | |
| BARCLAYS CAPITAL INC., | § | **D-95th** |
| | § | |
| **Defendants.** | § | _____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE COURT:

COME NOW PLAINTIFFS LONE STAR FUND V (U.S.), L.P. ("Lone Star Fund") and

LSF5 BOND HOLDINGS, LLC ("LSF5") (individually or collectively "Lone Star" or

"Plaintiffs") and file this Original Petition against Defendants Barclays Bank PLC ("Barclays

PLC") and Barclays Capital Inc. ("Barclays Capital") (collectively, "Defendants" or "Barclays").

### I.     DISCOVERY CONTROL PLAN

This case will proceed under Discovery Control Plan Level II pursuant to Rule 190.3 of

the Texas Rules of Civil Procedure.  Plaintiffs reserve the right to move for the entry of a

discovery control plan pursuant to Rule 190.4 of the Texas Rules of Civil Procedure.

### II.     NATURE OF THE ACTION

1.     This is a case about a $60 million fraud orchestrated and perpetrated by Barclays,

a global financial institution and investment banking firm.  In mid-2007, Barclays created and

sold securities in a structured finance product called mortgage pass-through certificates

("MPTCs" or "Certificates").  The MPTCs are securities that are backed, or collateralized, by

pools of residential mortgage loans.  In order to induce investors to purchase the Certificates in

two securities offerings, Barclays made representations and assurances that it now admits were not only false, but in violation of express terms of the offering documents that were provided to Lone Star and other investors.

2.      LSF5, an affiliate of Lone Star Fund, a Texas-based private equity fund, purchased approximately $60 million in Certificates from Barclays.  Lone Star decided to purchase the Certificates from Barclays only after extensive one-on-one discussions and negotiations with Barclays in Texas in which Barclays repeatedly assured Lone Star regarding its "comprehensive" due diligence process and made representations as to the quality of the Certificates.

3.      In the offering materials, all of which were publicly filed with the U.S. Securities and Exchange Commission, Barclays represented that the collateral underlying the Certificates – pools of residential mortgage loans – was in good standing and that none of the mortgage loans in the pools had been delinquent from the time they were originated until the time of the Barclays' securities offerings.[1]  The quality of the underlying mortgage loans is of critical importance to investors in a mortgage-backed security because investment returns depend on the income stream generated by the timely payment of the underlying mortgage loan obligations.  In general, if a mortgage loan becomes delinquent, the cash available for distribution to investors is reduced or eliminated, materially affecting not only the income stream but also the value of the Certificates.

4.      Within months of purchasing the Certificates from Barclays, Lone Star discovered that, notwithstanding Barclays' representations and assurances, a material number of the mortgage loans underlying the Certificates purchased by Lone Star had been, in fact, delinquent

---

[1] Barclays' "no delinquency" representation was subject to certain exceptions, all of which involved loans that were listed on a schedule contained in the offering materials ("Excepted Loans").  LSF5's Petition does not pertain to the Excepted Loans.

as of the dates of the offerings. As further described below, Lone Star purchased Certificates within a period of one month in two related offerings by Barclays – the "BR2" and "BR3" securities offerings. Unbeknownst to Lone Star, the pool of mortgage loans underlying the BR2 securities offering (the "BR2 Loan Pool") and the pool of mortgage loans underlying the BR3 securities offering (the "BR3 Loan Pool"; together with the BR2 Loan Pool, the "Loan Pools") each contained a material number of delinquent loans at the time that Barclays sold them to Lone Star. If Lone Star had known about these delinquencies in the Loan Pools, it would not have purchased the Certificates.

5.      Each and every document revealing the number of delinquencies in the Loan Pools was within Barclays' possession or under its control. It is thus clear that Barclays knew that the representations in the offering materials were false, and Barclays used the Loan Pools and the BR2 and BR3 offerings as a place to unload troubled mortgage loans, all at Lone Star's expense.

6.      As a direct result of Barclays' wrongdoing, Lone Star has suffered – and continues to suffer – material financial harm and loss.

### III.   THE PARTIES

7.      Plaintiff Lone Star Fund is a limited partnership organized and existing under and by the laws of the State of Delaware, with its principal place of business in Dallas, Texas. Lone Star Fund's limited partners include, among others, citizens of the States of Texas, New York, and Connecticut. Lone Star Fund is an indirect owner of LSF5, and LSF5 holds investments for the benefit of the Lone Star Fund's limited partners.

8.      Plaintiff LSF5, an affiliate of Lone Star Fund, is a limited liability company organized, existing under, and by virtue of the laws of the State of Delaware, with its principal place of business in Hamilton, Bermuda. LSF5 has seven corporate officers, six of whom reside

in the State of Texas.

9.    Defendant Barclays PLC is a public limited company registered in England and Wales, with its registered head office in London, England.  Barclays PLC maintains a branch office in New York, New York.  Barclays PLC is (1) the 100% owner of Barclays Capital, the underwriter for the BR2 and BR3 securities offerings, (2) the administrator and affiliate of Sutton Funding LLC ("Sutton"), which is the sponsor of the BR2 and BR3 securities offerings, and (3) the 100% owner of Securitized Asset Backed Receivables LLC ("SABR"), the Depositor of the mortgage loans into the BR2 and BR3 Trusts.  Barclays PLC may be served with process by serving its registered agent for service of process, CT Corporation System, 350 North St. Paul Street, Dallas, TX 75201.

10.    Defendant Barclays Capital is a corporation organized and existing under and by virtue of the laws of the State of Connecticut, with its principal place of business in New York, New York.  Barclays Capital is the investment banking division of Barclays PLC.  Barclays Capital was the underwriter for the BR2 and BR3 securities offerings.  Barclays Capital may be served with process by serving its registered agent for service of process, CT Corporation System, 350 North St. Paul Street, Dallas, TX 75201.  In the alternative, Barclays Capital engages in business in this State as provided in TEX. CIV. PRAC. & REM. CODE § 17.042 but has not designated a resident agent for service of process.  As such, Barclays Capital may be served with process by serving the Texas Secretary of State as its agent for service, with service to be forwarded to Barclays Capital's home office and principal place of business, Barclays Capital Inc., 200 Park Avenue, New York, New York 10166, as well as to its registered agent for service of process in New York, CT Corporation System, 111 Eighth Avenue, New York, New York 10011.

**PLAINTIFFS' ORIGINAL PETITION**                                        **PAGE 4**

## IV.    JURISDICTION AND VENUE

11.    This action arises under the Texas Securities Act, TEX. REV. CIV. STAT. ANN. ART. 581, § 33, TEX. BUS. & COM. CODE ANN. § 27.01, the common law of Texas, and the Securities Act of 1933, 15 U.S.C. §§ 77, *et seq.*

12.    Barclays' offer and sale of securities at issue herein was made to Lone Star in Texas.  Barclays purposefully availed itself of the benefits and protections of the forum by, among other things, (a) regularly exchanging e-mail and telephone calls with Lone Star relating to the offer and sale of securities; (b) making an in-person visit and presentation to Lone Star in Dallas with regard to the offer and sale of these securities; and (c) causing Lone Star to suffer harm in Texas as a result of its tortious and fraudulent conduct.  Accordingly, Barclays is subject to personal jurisdiction in Texas.

13.    Venue is proper in Dallas County pursuant to Section 15.002(a)(1) of the Texas CIVIL PRACTICE & REMEDIES CODE because all or a substantial part of the events or omissions giving rise to the claims occurred in Dallas County or, in the alternative, pursuant to Section 15.002(a)(4) because Lone Star Fund resided in Dallas County at the time the causes of action accrued.  Specifically, Barclays' misrepresentations and solicitations were directed to Lone Star in Dallas, Texas, and Lone Star suffered harm in the State of Texas as a result of Defendants' tortious and fraudulent conduct.

14.    This action is not removable to federal court because (1) Lone Star asserts claims against Defendants under the Securities Act of 1933, which provides that "no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States," 15 U.S.C. § 77v(a); and (2) there is no diversity of citizenship for purposes of diversity jurisdiction under 28 U.S.C. § 1332 because (a) Plaintiff Lone Star Fund is a citizen for diversity purposes of, among other states, New York and Connecticut, by virtue of

the fact that at least one of its limited partners is a citizen of New York and at least one of its limited partners is a citizen of Connecticut, and (b) Defendant Barclays Capital is also a citizen of New York and Connecticut because its principal place of business is New York and it is incorporated in Connecticut.

## V.    FACTUAL BACKGROUND

### Barclays Structured and Marketed the BR2 and BR3 Securities Offerings

15.    The Certificates are commonly known as mortgage-backed securities.  In general, mortgage-backed securities are financial instruments that are created by pooling and securitizing mortgage loans.  The issuer of the mortgage-backed securities acquires an inventory of mortgage loans, and then sells rights to the cash flows from the mortgage loans to investors.  The rights to the cash flows are divided into various layers or tranches in accordance with the expected cash flows and risks associated with the mortgage-backed securities.

16.    The assets underlying the Certificates sold to Lone Star by Barclays are mortgage loans secured by first- or second-lien mortgages or deeds of trust on residential real estate in the U.S. (the "Mortgage Loans").  Defendant Barclays PLC, through its affiliate, purchased the underlying Mortgage Loans from two residential mortgage loan originators.

17.    Barclays arranged for the creation of two trusts (the "BR2 Trust" and the "BR3 Trust") to hold the Mortgage Loans and issue the Certificates.  Barclays, through its affiliates, created pools of Mortgage Loans and transferred them to the BR2 and BR3 Trusts, which in turn issued the Certificates.

18.    Barclays Capital underwrote both the BR2 and BR3 securities offerings.  As underwriter, Barclays Capital caused the BR2 and BR3 Trusts to be established, developed the offering documents, marketed the offerings, solicited investors, and priced the Certificates.  Barclays Capital arranged the types of securities that comprised the tranches of the BR2 and BR3

Certificates and structured the risk profile for each tranche.

19.     Barclays Capital was responsible for preparing the Prospectus dated December 11, 2006 relating to both the BR2 and BR3 securities offerings (the "Prospectus"), as well as the Prospectus Supplement dated May 16, 2007 relating to the BR2 securities offering (the "BR2 Supplemental Prospectus") and the Prospectus Supplement dated June 16, 2007 relating to the BR3 securities offering (the "BR3 Supplemental Prospectus"; collectively with the BR2 Supplemental Prospectus, the "Supplemental Prospectuses").

20.     The Supplemental Prospectuses each provided that Barclays PLC would represent and warrant that, as of the Closing Dates for the BR2 and BR3 securities offerings (which were May 17, 2007 for the BR2 offering, and June 13, 2007 for the BR3 offering), none of the relevant Mortgage Loans were or ever had been delinquent.  Barclays did in fact provide such representations in two substantively identical documents (the "Barclays Representations"), which were presented to investors with the intent that they be relied upon.  Each of these Barclays Representations contains substantially identical language and represents that none of the Mortgage Loans in the Loan Pools were delinquent, nor had any ever been delinquent, as of the Closing Date.

21.     Barclays Capital, as underwriter, sold approximately $60 million in Certificates to Lone Star.  Lone Star purchased approximately $45 million in BR2 Certificates in a private placement in May 2007.  Lone Star purchased approximately $15.8 million in BR3 Certificates in the public offering pursuant to the BR3 Supplemental Prospectus in June 2007.

### Barclays Misrepresented That No Mortgage Loans Were Delinquent as of the Closing Date

22.     As set forth above, Barclays represented that none of the Mortgage Loans underlying the BR2 and BR3 securities offering were delinquent, nor had any ever been

delinquent, as of the Closing Dates. Barclays made these representations intending and enabling that investors such as Lone Star would rely on them.

23.     In fact, Barclays knew at the time of the BR2 securities offering, or recklessly disregarded the fact that a significant number of loans in the BR2 Loan Pool had been delinquent for 30 days or more at some point prior to the Closing Date, defined as May 17, 2007.

24.     Furthermore, Barclays knew at the time of the BR3 securities offering, or recklessly disregarded the fact that a significant number of loans in the BR3 Loan Pool had been delinquent for 30 days or more at some point prior to the Closing Date, defined as June 13, 2007.

### In Soliciting Lone Star to Purchase the Certificates, Barclays Touted the Due Diligence It Had Purportedly Performed on the Underlying Mortgage Loan Pools.

25.     In March 2007, Barclays Capital began discussions with Lone Star regarding potential investment opportunities in the mortgage securitization market. The discussions with Barclays Capital took place primarily either in Dallas, Texas, or telephonically with Lone Star participating in Dallas.

26.     On or about March 6, 2007, representatives of Barclays Capital met with Lone Star in Dallas to discuss potential investment opportunities for Lone Star in mortgage-backed securities.

27.     Throughout March and April 2007, Barclays presented Lone Star with a variety of investment opportunities in the secondary market for mortgage loans. The discussions between Barclays and Lone Star focused on mortgage-backed securities offerings by Barclays. In these discussions, Lone Star repeatedly asked Barclays about the completeness and accuracy of Barclays' diligence and underwriting procedures on the underlying Mortgage Loans.

28.     Barclays Capital represented to Lone Star, among other things, that it was

comprehensive and complete in its underwriting and diligence.

29.    The Prospectus Supplements also stated that Barclays performed extensive diligence on the Mortgage Loans.

30.    The marketing, diligence and offering materials provided to Lone Star by Barclays concealed the fact that a significant number of the Mortgage Loans had been delinquent as of the Closing Dates.

### Lone Star Purchased Certificates in the BR2 and BR3 Offerings in Reliance on Barclays' Misrepresentations

31.    On or about May 16, 2007, Lone Star paid Barclays $45,338,000.00 for Certificates issued in the BR2 securities offering.  On or about May 17, 2007, Lone Star wired payment for the purchase of the BR2 Certificates from an account at JP Morgan Chase in Houston, Texas to Barclays in New York.

32.    On or about June 7, 2007, Lone Star paid Barclays $15,871,517.30 for Certificates issued in the BR3 securities offering.  On or about June 7, 2007, Lone Star wired payment for the purchase of the Class B-3 Certificates from an account at JP Morgan Chase in Houston, Texas to Barclays in New York.

33.    Lone Star relied on Barclays' representations regarding the diligence it purportedly conducted on the underlying Mortgage Loans in purchasing the BR2 and BR3 Certificates and on Barclays' representations that none of the Mortgage Loans underlying the Certificates were delinquent or had ever been delinquent prior to the Closing Date.  But for Barclays' representations and assurances that it had conducted comprehensive diligence and that the Mortgage Loans had not been delinquent from inception until the Closing Dates, Lone Star would not have purchased the BR2 or BR3 Certificates.  Barclays knew that Lone Star was in the limited class of persons who would rely on their representations.

34.     When the BR2 and BR3 Certificates were purchased, Lone Star did not know, nor did they have any reason to suspect, that Barclays' statements were false and misleading.  Lone Star was misled by the Prospectus, the Prospectus Supplements, the Barclays Representations, and otherwise by Barclays' representations to Lone Star, including the representations regarding the diligence conducted on the underlying Loan Pools and the representations that the Mortgage Loans had not been delinquent from loan inception until the Closing Dates.  Had Lone Star known the truth, Lone Star would not have purchased the BR2 or BR3 Certificates.

### Lone Star Discovered, after Purchasing the Certificates, That Barclays' Representations Were False

35.     The June 2007 Trustee report for the BR2 Trust disclosed that a significant number of the Mortgage Loans in the BR2 Loan Pool were delinquent for 60 days.  As a result, Lone Star began inquiring of the Trustee, the Servicer, and Barclays regarding delinquencies in the BR2 Loan Pool.

36.     Lone Star received materials from the Trustee, the Servicer, and Barclays and undertook an analysis of the payment and default histories for certain Mortgage Loans in both the Loan Pools.  Based upon this analysis, Lone Star learned that a significant number of the Mortgage Loans underlying the BR2 Certificates and BR3 Certificates had been delinquent as of the relevant Closing Date, notwithstanding the representations and assurances of Barclays to the contrary.  Lone Star informed Barclays of the results of its analysis, and Barclays admitted that a significant number of Mortgage Loans underlying the BR2 Certificates had been delinquent prior to the relevant Closing Date.  Barclays has refused to provide Lone Star any additional information requested by Lone Star regarding the Mortgage Loans.

37.     Barclays knew that the delinquency representations contained in the Barclays Representations and the representations regarding its due diligence in underwriting these

transactions were false when they were made.  Barclays and/or its affiliates and agents had access to all of the loan payment information with respect to both the BR2 and BR3 Trusts prior to their Closing Dates and prior to the dates when the misrepresentations were made to Lone Star.

38.     Barclays knew or should have known that Lone Star would rely on, among other things, the information in the Prospectus, the Prospectus Supplements, and the Barclays Representations when purchasing the Certificates.

39.     Had Barclays properly identified and disclosed to Lone Star the number of Mortgage Loans that had been delinquent prior to the Closing Date, and the deficiencies in its own due diligence, Lone Star would not have purchased the BR2 or BR3 Certificates.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of the TEXAS SECURITIES ACT, TEXAS CIVIL STATUTE ARTICLE 581, Section 33A**

40.     Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.

41.     Barclays offered and sold the BR2 and BR3 Certificates to investors, including Lone Star.  In doing so, Barclays defrauded Lone Star, made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

42.     Barclays made or omitted to make statements with a reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of the BR2 and BR3 Certificates.  Barclays' misrepresentations:  (i) deceived Lone Star that no Mortgage Loans were delinquent as of the Closing Dates; (ii) artificially inflated and maintained the price of the Certificates; (iii) caused Lone Star to purchase the Certificates at artificially inflated prices; and (iv) deprived Lone Star of the expected return on its investment.

43.     In the Barclays Representations, Barclays PLC represented that:

> (i) All payments required to be made up to the Closing Date for the Mortgage Loan under the terms of the Mortgage Note, other than payments not yet 30 days delinquent, have been made and credited, (ii) no payment required under the Mortgage Loan has been 30 days or more delinquent at any time since the origination of the Mortgage Loan, and (iii) the first Monthly Payment was made with respect to the Mortgage Loan on its related Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note.

44.     Barclays misrepresented that it had conducted thorough due diligence on the Mortgage Loans in the BR2 and BR3 Loan Pools.

45.     The foregoing representations were false at the time they were made and Barclays knew the representations were false.

46.     These misrepresentations were material to Lone Star in deciding to invest in the Certificates.

47.     As a direct and proximate result of Barclays' wrongful conduct, Barclays caused Lone Star to incur substantial monetary damages.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Violation of the TEXAS SECURITIES ACT, TEXAS CIVIL STATUTE ARTICLE 581, Section 33F

48.     Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.

49.     Barclays Capital violated the Texas Securities Act by selling Certificates to Lone Star by virtue of false and misleading statements of material fact.

50.     Barclays PLC directly and indirectly, with intent to deceive or defraud or with reckless disregard for the truth or the law, materially aided Barclays Capital in the fraudulent sale of the Certificates.  In doing so, Barclays PLC materially aided Barclays Capital in making untrue statements of material fact and omitting material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

51.     Barclays PLC knew, or acted with reckless disregard for the truth in not knowing, that Barclays Capital's representations regarding the quality of the Loan Pools were false.

52.     Barclays PLC  purchased the Mortgage Loans from the loan originators.  Thus, Barclays PLC had knowledge regarding the delinquency status of the Mortgage Loans but failed to correct its statements to investors prior to the purchase of the Certificates by investors from Barclays Capital.

53.     Barclays made or omitted to make statements with a reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of the BR2 and BR3 Certificates.  Barclays' misrepresentations were intended to and did:  (i) deceive Lone Star that no Mortgage Loans were delinquent as of the Closing Dates; (ii) artificially inflate and maintain the price of the Certificates; (iii) cause Lone Star to purchase the Certificates at artificially inflated prices; and (iv) deprive Lone Star of the expected return on its investment.

54.     In the Barclays Representations, Barclays PLC represented that:

(i) All payments required to be made up to the Closing Date for the Mortgage Loan under the terms of the Mortgage Note, other than payments not yet 30 days delinquent, have

been made and credited, (ii) no payment required under the Mortgage Loan has been 30 days or more delinquent at any time since the origination of the Mortgage Loan, and (iii) the first Monthly Payment was made with respect to the Mortgage Loan on its related Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note.

55.     Barclays PLC's representations were false at the time they were made and Barclays PLC knew the representations were false or acted with reckless disregard for the truth in not knowing that its statements were false.

56.     Plaintiff Lone Star reasonably and justifiably relied on Barclays PLC's misrepresentations in deciding to purchase the BR2 and BR3 Certificates from Barclays Capital.

57.     Lone Star would not have purchased the Certificates if:  (a) Barclays PLC had not represented that it had reviewed each loan file as part of its due diligence; and (b) the Prospectus Supplements and the Pooling Agreements had accurately stated the status of the Mortgage Loans as of the Closing Dates.

58.     As a direct and proximate result of Barclays PLC's aiding and abetting Barclays Capital's fraud, Lone Star has suffered damages.

## THIRD CAUSE OF ACTION

### Control Person Liability for Violation of the TEXAS SECURITIES ACT, TEXAS CIVIL STATUTE ARTICLE 581, Section 33F

59.     Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.  This cause of action is asserted against Barclays PLC.

60.     Barclays PLC exercised active control over the day-today affairs of Barclays Capital and had the power to influence or control the transactions that gave rise to violations of the Texas Securities Act alleged above.  As such, Barclays PLC is a controlling person of Barclays Capital and is jointly and severally liable to Lone Star.

61.     As a direct and proximate result of Barclays PLC's acts, Lone Star has suffered

damages.

## FOURTH CAUSE OF ACTION

### Violation of Section 27.01 of the TEXAS BUSINESS AND COMMERCE CODE

62.    Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.

63.    Barclays directly and indirectly engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lone Star, made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

64.    Barclays made or omitted to make statements with a reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of the BR2 Certificates and the BR3 Certificates.  Barclays' misrepresentations were intended to and did:  (i) deceive Lone Star that no Mortgage Loans were delinquent as of the Closing Dates; (ii) artificially inflate and maintain the price of the Certificates; (iii) cause Lone Star to purchase the Certificates at artificially inflated prices; and (iv) deprive Lone Star of the expected return on its investment.

65.    In the Barclays Representations, Barclays PLC represented that:

(i) All payments required to be made up to the Closing Date for the Mortgage Loan under the terms of the Mortgage Note, other than payments not yet 30 days delinquent, have been made and credited, (ii) no payment required under the Mortgage Loan has been 30 days or more delinquent at any time since the origination of the Mortgage Loan, and (iii) the first Monthly Payment was made with respect to the Mortgage Loan on its related Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note.

66.    Barclays knew the foregoing representations were false or made the representations with reckless disregard for the truth.

67.    Barclays made the foregoing misrepresentations and/or omissions with the intent

PLAINTIFFS' ORIGINAL PETITION                                    PAGE 15

to induce purchasers of the Certificates.

68.     Lone Star reasonably and justifiably relied on Defendants' misrepresentations in

deciding to purchase the BR2 and BR3 Certificates.

69.     Lone Star would not have purchased the Certificates if:  (a) Barclays had not

represented in its marketing materials that it had reviewed each loan file as part of its due

diligence; or (b) the Prospectus Supplements and the Pooling Agreements had accurately stated

the status of the loans as of the Closing Dates.

70.     As a direct and proximate result of Barclays' wrongful conduct, Barclays caused

Lone Star to incur substantial monetary damages.

## FIFTH CAUSE OF ACTION

### Aiding and Abetting Violation of the TEXAS BUS. & COM. CODE, Section 27.01

71.     Lone Star hereby realleges and incorporates all paragraphs above as if set forth in

full herein.

72.     Barclays PLC directly and indirectly, with intent to deceive or defraud or with

reckless disregard for the truth or the law, materially aided Barclays Capital in the fraudulent sale

of the Certificates.  In doing so, Barclays PLC materially aided Barclays Capital in making

untrue statements of material fact and omitting material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading and

false.

73.     Barclays PLC knew, or acted with reckless disregard for the truth in not knowing,

that Barclays Capital's representations regarding the quality of the Loan Pools were false.

74.     Barclays PLC purchased the Mortgage Loans from loan originators.  Thus,

Barclays PLC had knowledge regarding the delinquency status of the Mortgage Loans but failed

to correct its statements to investors prior to the purchase of the Certificates by investors from Barclays Capital.

75.    Barclays made or omitted to make statements with a reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of the BR2 and BR3 Certificates. Barclays' misrepresentations were intended to and did: (i) deceive Lone Star that no Mortgage Loans underlying the Certificates were delinquent as of the Closing Dates; (ii) artificially inflate and maintain the price of the Certificates; (iii) cause Lone Star to purchase the Certificates at artificially inflated prices; and (iv) deprive Lone Star of the expected return on its investment.

76.    In the Barclays Representations, Barclays PLC represented that:

(i) All payments required to be made up to the Closing Date for the Mortgage Loan under the terms of the Mortgage Note, other than payments not yet 30 days delinquent, have been made and credited, (ii) no payment required under the Mortgage Loan has been 30 days or more delinquent at any time since the origination of the Mortgage Loan, and (iii) the first Monthly Payment was made with respect to the Mortgage Loan on its related Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note.

77.    Barclays PLC's representations were false at the time they were made and Barclays PLC knew the representations were false or acted with reckless disregard for the truth in not knowing that its statements were false.

78.    Plaintiff Lone Star reasonably and justifiably relied on Barclays PLC's misrepresentations in deciding to purchase the BR2 and BR3 Certificates from Barclays Capital.

79.    Lone Star would not have purchased the Certificates if: (a) Barclays PLC had not represented that it had reviewed each loan file as part of its due diligence; and (b) the Prospectus Supplements and the Pooling Agreements had accurately stated the status of the Mortgage Loans as of the Closing Dates.

80.    Barclays PLC benefited from Defendant Barclays Capital's material

**PLAINTIFFS' ORIGINAL PETITION**               **PAGE 17**

misrepresentations.

81. As a direct and proximate result of Barclays PLC's aiding and abetting Barclays Capital's fraud, Lone Star has suffered damages.

## SIXTH CAUSE OF ACTION

### Common Law Fraud

82. Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.

83. As detailed above, Barclays intentionally made false and misleading statements and/or material omissions of fact to Lone Star in connection with their purchase of Certificates.

84. Barclays knew the representations were false at the time they were made.

85. Such statements of fact were material to Lone Star in its decision to purchase the Certificates.

86. Lone Star reasonably relied upon Barclays' materially false and misleading misrepresentations and/or material omissions of fact.

87. Barclays intended that Lone Star would act on its misrepresentations and purchase the Certificates.

88. Lone Star was damaged as a result of Barclays' materially false and misleading statements and/or material omissions of fact.

## SEVENTH CAUSE OF ACTION

### Negligent Misrepresentation

89. Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.

90. As detailed above, Barclays made false and misleading statements and/or material omissions of fact to Lone Star in connection with their purchase of Certificates.

**PLAINTIFFS' ORIGINAL PETITION**                                   **PAGE 18**

91.     Barclays PLC and Barclays Capital made such misrepresentation in the course of the BR2 and BR3 securities offerings.

92.     Barclays PLC and Barclays Capital had pecuniary interests in the BR2 and BR3 securities offerings.

93.     Such statements of fact were made to Lone Star with the intent that they would rely on them.

94.     Lone Star reasonably and justifiably relied upon Barclays' materially false and misleading misrepresentations and/or material omissions of fact.

95.     Barclays PLC and Barclays Capital knew, or in the exercise of reasonable care should have known, that their representations were false.

96.     Lone Star was damaged as a result of Barclays' materially false and misleading statements and/or material omissions of fact.

97.     Lone Star was in the limited class of persons Barclays knew would rely on its representations.

## EIGHTH CAUSE OF ACTION

### Violation of Section 12(a)(2) of the Securities Act of 1933

98.     Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.

99.     Barclays Capital directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or the mails, offered and sold the BR3 Certificates to investors by means of a prospectus and oral communications. In doing so, Barclays defrauded Lone Star, made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and

false.

100.   Barclays Capital made or omitted to make statements with a reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of the BR3 Certificates.  Barclays Capital's misrepresentations were intended to and did:  (i) deceive Lone Star that no Mortgage Loans were delinquent as of the Closing Date; (ii) artificially inflate and maintain the price of the Certificates; (iii) cause Lone Star to purchase the Certificates at artificially inflated prices; and (iv) deprive Lone Star of the expected return on its investment.

101.   The Prospectus Supplement through which the BR3 Certificates were offered provides that:

> Pursuant to the representations and warranties agreement (the "Barclays Representation Agreement"), Barclays will make representations and warranties with respect to each mortgage loan NC Capital sold to the sponsor as of the closing date . . . , including but not limited to:
>
> (1) As of the servicing transfer date, except with respect to the Delinquent mortgage loans described under "The Mortgage Loan Pool – General" in this prospectus supplement, no payment required under the mortgage loan is 30 days or more Delinquent nor has any payment under the mortgage loan been 30 days or more Delinquent at any time since the origination of the mortgage loan.

102.   In the BR3 Barclays Representations, Barclays PLC represented that:

> All payments required to be made up to the Closing Date for the Mortgage Loan under the terms of the Mortgage Note, other than payments not yet 30 days delinquent, have been made and credited, (ii) no payment required under the Mortgage Loan has been 30 days or more delinquent at any time since the origination of the Mortgage Loan, and (iii) the first Monthly Payment was made with respect to the Mortgage Loan on its related Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note.

103.   The foregoing representations were false at the time they were made and Barclays Capital knew the representations were false or made the representations with reckless disregard to the truth.

104.    Barclays Capital made the foregoing misrepresentations and/or omissions with the intent to influence purchasers of the Certificates.

105.    Lone Star reasonably and justifiably relied on the misrepresentations made by Defendants, or the misrepresentations Barclays Capital made by omission, in deciding to purchase the BR3 Certificates.

106.    Barclays Capital actively solicited Lone Star's investment in the BR3 securities offering with a motivation to serve its own financial interests.

107.    Lone Star purchased the BR3 Certificates from Barclays Capital, as underwriter.

108.    Barclays Capital earned substantial underwriting fees for underwriting the BR3 securities offering.

109.    Lone Star would not have purchased the Certificates if:  (a) Barclays Capital had not represented that it had reviewed each loan file as part of its due diligence; and (b) the Prospectus Supplement and the BR3 Pooling Agreement had accurately stated the status of the Mortgage Loans as of the Closing Dates.

110.    As a direct and proximate result of Barclays' wrongful conduct, Defendant Barclays Capital has caused Lone Star to incur substantial monetary damages.  The performance of that portion of the BR3 Loan Pool that was, or had been, delinquent at the time the BR2 securities offering closed is materially poorer than the performance of the BR3 Loan Pool that was not, nor had ever been, delinquent at the time of the BR3 securities offerings, resulting in fewer distributions to Lone Star.

## NINTH CAUSE OF ACTION

### Violation of Section 11 of the Securities Act of 1933

111.    Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.

**PLAINTIFFS' ORIGINAL PETITION**                                        **PAGE 21**

112.     Barclays Capital directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or the mails, offered and sold the BR3 Certificates to investors by means of a prospectus.  In doing so, Barclays Capital defrauded Lone Star, made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

113.     Barclays Capital made or omitted to make statements with a reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of the BR3 Certificates.  Barclays Capital's misrepresentations were intended to and did:  (i) deceive Lone Star that no Mortgage Loans were delinquent as of the Closing Date; (ii) artificially inflate and maintain the price of the Certificates; (iii) cause Lone Star to purchase the Certificates at artificially inflated prices; and (iv) deprive Lone Star of the expected return on its investment.

114.     The Prospectus Supplement through which the BR3 Certificates were offered provides that:

> Pursuant to the representations and warranties agreement (the "Barclays Representation Agreement"), Barclays will make representations and warranties with respect to each mortgage loan NC Capital sold to the sponsor as of the closing date . . . , including but not limited to:
>
> (1)  As of the servicing transfer date, except with respect to the Delinquent mortgage loans described under "The Mortgage Loan Pool – General" in this prospectus supplement, no payment required under the mortgage loan is 30 days or more Delinquent nor has any payment under the mortgage loan been 30 days or more Delinquent at any time since the origination of the mortgage loan.

115.     In the BR3 Barclays Representations, Barclays PLC represented that:

> All payments required to be made up to the Closing Date for the Mortgage Loan under the terms of the Mortgage Note, other than payments not yet 30 days delinquent, have been made and credited, (ii) no payment required under the Mortgage Loan has been 30 days or more delinquent at any time since the origination of the Mortgage Loan, and (iii) the first Monthly Payment was made

with respect to the Mortgage Loan on its related Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note.

116.   The foregoing representations were false at the time they were made and Barclays Capital knew the representations were false or made the representations with reckless disregard to the truth.

117.   Barclays Capital made the foregoing misrepresentations and/or omissions with the intent to influence purchasers of the Certificates.

118.   Plaintiff Lone Star reasonably and justifiably relied on the misrepresentations made by Defendants, or the misrepresentations Barclays Capital made by omission, in deciding to purchase the BR3 Certificates.

119.   Barclays Capital actively solicited Lone Star's investment in the BR3 securities offering with a motivation to serve its own financial interests.

120.   Lone Star purchased the BR3 Certificates from Barclays Capital, as underwriter.

121.   Barclays Capital earned substantial underwriting fees for underwriting the BR3 securities offering.

122.   Lone Star would not have purchased the Certificates if:  (a) Barclays Capital had not represented that it had reviewed each loan file as part of its due diligence; and (b) the Prospectus Supplement and BR3 Pooling Agreement had accurately stated the status of the Mortgage Loans as of the Closing Dates.

123.   As a direct and proximate result of Barclays Capital's wrongful conduct, Defendant Barclays Capital has caused Lone Star to incur substantial monetary damages.  The performance of that portion of the BR3 Loan Pool that was delinquent at the time the securities offering closed is materially poorer than the performance of the BR3 Loan Pool that was not delinquent at the time of the BR3 securities offerings, resulting in fewer distributions to Lone

Star.

## TENTH CAUSE OF ACTION

### Control Person Liability – Section 15 of the Securities Act of 1933

124.    Lone Star hereby realleges and incorporates all paragraphs above as if set forth in full herein.  This cause of action is asserted against Barclays PLC for violation of Section 15 of the Securities Act of 1933.

125.    By reason of its ownership of Barclays Capital, Barclays PLC had the power, and exercised such power, to control the acts and representations of Barclays Capital alleged above. Barclays PLC was a culpable participant in the violations of the Securities Act alleged above.

126.    As such, Barclays PLC is a controlling person of Barclays Capital and is jointly and severally liable to Lone Star.

127.    As a direct and proximate result of Barclays PLC's acts, Lone Star has suffered damages.

## VII.    DAMAGES

128.    Based on the wrongful conduct of Defendants, Lone Star has suffered actual damages in excess of the minimum jurisdictional limits of this court.  In addition, Lone Star is entitled to exemplary damages, attorneys' fees, pre-judgment and post-judgment interest, and all other damages to which it may be entitled under the law.

## VIII.   REQUEST FOR DISCLOSURE

129.    Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Defendants are requested to disclose the information or material described in Rule 194.2.

## IX.    PRAYER FOR JUDGMENT AND RELIEF

WHEREFORE, Lone Star respectfully requests that the Court enter a judgment in its favor for: